IMMANUEL'S GEMEINDE *et al.* v. FRED. KEIL *et al.*

No. 11,406.*  (58 Pac. 973.)

1. RELIGIOUS CORPORATION — *Division of Property.* Where the members of an independent incorporated church organization are nearly equally divided by irreconcilable differences in matters of faith and doctrine regarded vitally essential by each faction, and neither has forfeited any rights to the property under the constitution of the church, it is not error for a court of equity to decree a sale of the church property and a division of the proceeds arising therefrom among the members.

2. ——— *Manner of Conducting Sale.* The real estate on which the church stands having been deeded with a clause in the conveyance that it was to be used for church purposes, and the parsonage adjacent thereto having been built with money contributed with like intention on the part of the donors, *held*, that at the sale under the decree the privilege of purchasing should first be given to the two factions, and that the one paying the higher price should be entitled to exclusive ownership. If neither sees fit to purchase, the sale should then be opened to all bidders.

Error from court of appeals, northern department; JOHN H. MAHAN, ABIJAH WELLS, and SAM'L W. MC-ELROY, judges. Opinion filed November 11, 1899. Modified.

*For opinion by court of appeals, see 8 Kan. App. 405, 54 Pac. 800.—REP.

### STATEMENT.

THIS action was commenced in the district court by Fred. Keil, J. G. Michaelis, and J. F. Karst, who, it is alleged, were acting for themselves and 147 others in bringing the action, all being members of a church congregation of the Lutheran faith. The defendants in the action below were Immanuel's Gemeinde, a religious corporation, Fred. Nuss, and eight others, who, it is alleged, were in possession of the church property, keeping the same locked, by which plaintiffs below were deprived of the use thereof. The prayer of the petition asked for an injunction, and, if this relief was denied, then that the church property be partitioned; or, if the latter be impracticable, that the property be sold and the proceeds divided between the two contending factions, and for general relief. The petition sets forth at length the dissensions in the church which gave rise to the controversy. A trial was had before the court, and its conclusions of fact and law were as follows:

"1. It is found by the court that plaintiffs' faction and defendants' faction are members of a religious society, and compose a congregation known and denominated as Lutherans.

"2. The faction composing plaintiffs' faction consists of about forty members of the said congregation who are heads of families.

"3 The defendant faction are of the number of ——, who are likewise heads of families and members of said congregation.

"4. Immanuel's Gemeinde became incorporated under the laws of Kansas on the —— day of ——, 1885, under the name of the Immanuel's Gemeinde.

"5. The plaintiff faction sue in this action to recover the possession of lands described in the petition and upon which a church building was erected, and likewise sue to recover possession of certain lands described in the petition upon which a building for par-

Immanuel's Gemeinde v. Keil.

sonage was erected.  Plaintiffs also ask that, in case they shall not be entitled to recover the actual possession and control of said property, that they have other equitable relief as asked for in the petition ; and claim that they are deprived of the use and occupancy of all of said property by the defendants.

"6.  The petition of plaintiffs in this action that plaintiffs substantially claim that the property was dedicated and purchased for the use of a congregation which taught and practiced the tenets of faith and doctrines as taught by the synod of Iowa and other states, and that defendants' faction have excluded plaintiffs' faction from the use of such property in the employment and teachings of preachers and teachers who teach and preach the faith and doctrines taught by the synod of Iowa and other states.  And that the defendants' faction are using the church and property in furtherance of the teachings of the tenets of faith and doctrine taught by the synod of Missouri, Ohio, and other states, which plaintiffs allege teaches a fundamentally different doctrine of usage and faith from that taught by the synod of Iowa and other states ; and that in furtherance of this wrongful perversion of the use, have vocated or established a minister of the synod of Missouri, Ohio, and other states.

"7.  The congregation which was subsequently known as the Immanuel's Gemeinde met for worship in the private houses of George Keil and Samuel Morgenstern, first met in the year 1876, and continued to meet from time to time at said places until about 1878.

"8.  The schoolhouse known as the Rasner schoolhouse was built by funds contributed by the members composing the congregation who met at the private residences aforesaid, and that said schoolhouse was not a public schoolhouse but was and is a private schoolhouse, and was built for the use, among other things, of having religious teachings taught in the Lutheran faith.

"9.  The said schoolhouse was dedicated for religious worship in the year 1879, the Reverend Toenjes officiating at such dedication.

"10.  Reverend Toenjes was a Lutheran minister, of the synod of Missouri, Ohio, and other states.

"11. The congregation which met for worship in said private houses and in the said schoolhouse had church officers.

" 12. The people who composed the assembly of persons meeting at said private houses for religious worship, and in said schoolhouse, professed the Lutheran faith, and met to hold meetings in the Lutheran faith.

" 13. The congregation held religious services from time to time alternately every other Sunday, the minister officiating supplying the congregation one Sunday, and the following Sunday supplying the church at the Bender schoolhouse. This continued the greater part of the time from the year 1879 to about the spring of 1885.

" 14. The congregation held religious services in the Rasner schoolhouse from the spring of 1879 until some time in the year 1890.

" 15. Church services and preaching were conducted for such congregation by preachers of the Lutheran faith of the synod of Missouri, Ohio and other states from and including portions of the year 1876 up to about the spring of 1885.

" 16. On several occasions during said times from 1876 to 1885, and while the congregation was presided over by ministers from the synod of Missouri, Ohio, and other states, collections were taken up in said congregation by said pastors to be by them sent to the synod of Missouri, Ohio, and other states, to be used by it for benevolent and other purposes.

" 17. The names of the ministers preaching to the congregation from and including portions of 1876 to 1885 were Reverends Krause, Kaiser, and Toenjes, and that all of said ministers were members of the synod of Missouri, Ohio, and other states, claiming to be members of the Evangelical Lutheran faith.

" 18. The congregation, at a meeting of the congregation held ————, 1885, adopted the following written constitution, towit:

"'The following constitution was accepted by the Evangelical Lutheran Gemeinde (congregation) on the 26th day of April, A. D. 1885:
"'ARTICLE 1.—The Evangelical Lutheran Immanuel's Association, in Russell county, Kansas, professes the entire contents of the

Old and New Testaments and the confession of the Evangelical Lutheran church, and requires that a doctrine be taught and a life led in conformity with the scriptures and the confession of the church.

"'ARTICLE 2.—Every person who desires to become a member of this congregation must profess article 1 with all his heart.

"'ARTICLE 3.—Every member of this congregation is obliged faithfully to use the Word of God and holy sacraments; to visit (attend) the divine services diligently; to send his children to church and school faithfully; and to strive after a Christian life in every respect.

"'ARTICLE 4.—The congregation has the right and duty to vocate a pastor, who must be of the Evangelical Lutheran confession; to honor him; to submit to his official acts as long as they are based on the Word of God.

"'ARTICLE 5.—Whenever a pastor teaches a false doctrine which is not in conformity to and does not agree with the Word of God and the confessions of the church, or if he leads an ungodly life, the congregation has the right to discharge him, if he does not reform.

"'ARTICLE 6.—In case of complaint against a pastor, such complaints are to be examined, and a just and righteous decision shall be given by the president, or his substitute, of that synod to which the pastor belongs.

"'ARTICLE 7.—Whenever a member of the congregation has sinned against the Word of God, or rebels against the constitution, and constantly resists all reaggravation, as taught by our Lord Jesus Christ in the eighteenth chapter of the gospel of St. Matthew (according to St. M.), and does not repent, such member shall be excommunicated.

"'ARTICLE 8.—Every member is obliged to submit to each and every word of God, and in case where the Word of God allows us freedom he is obliged to yield to the majority, and to sign this constitution.

"'ARTICLE 9.—The congregation is to hold four regular meetings per annum, at the beginning of each quarter, and every member is obliged to appear or excuse himself, and to deport himself as a Christian.

"'ARTICLE 10.—The pastor is to preside in the meetings, or, he being absent, one of the elders, who shall be elected to preside.

"'ARTICLE 11.—The congregation shall elect its elders by a written vote for the term of two years, and promises to honor them.

"'ARTICLE 12.—Every member is expected to bear the burdens of the congregation according to his ability.

"'ARTICLE 13.—Everything bought by or donated to the congregation is the property of the congregation. Whosoever is excluded loses all claim to the property.

"'ARTICLE 14.—The elders of this congregation constitute the board of trustees, and shall represent the congregation before court.

"'ARTICLE 15.—The services shall be conducted in the German language, and as long as five members adhere to this constitution the property shall be theirs.'

" 19. At a public meeting of the congregation held about October 6, 1889, the question of the donation of land upon which to erect a church building, and a discussion of the purchase of lands upon which to

erect a parsonage was discussed, and nothing was said in said meeting to the effect that the property to be purchased and donated should be used for the teaching of the tenets of faith taught by any particular synod, and nothing was said upon that subject at said meeting.

"20. Money was procured for the purpose of building a church by the circulation of a subscription paper, and said church was built by the moneys so subscribed and collected.

"21. Said subscription paper contained the following heading, to wit: 'We, the undersigned, agree to give the sum set opposite our names for the purpose of erecting an Evangelical Lutheran church.'

"22. The congregation located or vocated (called) a pastor from the Iowa synod in the year 1885.

"23. From and including a portion of the year 1885, and up to and including the year 1894, ministers from the synod of Iowa and other states were located or vocated as pastors of such congregation.

"24. At a business meeting of members from the congregation held January, 1885, Reverend Studier talked to said members with reference to the difference in the doctrine, tenets and faith of the respective synod of Iowa and other states and of Missouri, Ohio, and other states.

"25. Reverend Studier was a minister of the synod of Iowa and other states.

"26. Subsequently to the talk aforesaid, and at the request of the congregation, one J. G. Michaelis, a member of said congregation, at the request of the congregation, wrote to the Reverend ———, of the Iowa synod, requesting him to send a pastor for said congregation.

"27. In response to said request Reverend Wittig came to said congregation, and he preached to said congregation in the year 1885, in the said Rasner schoolhouse.

"28. Reverend Augustine, of the Iowa synod, succeeded to Reverend Wittig as a pastor of said congregation, and he preached for said congregation, and

also for them taught the parochial school in said Ras-
ner schoolhouse.

"29. During the ministry of the ministers from
the synod of Iowa and other states, collections were
taken by them from the congregation for the use of
the synod of Iowa and other states.

"30. During the years 1889 and 1890, and during
the ministry of the Reverend Augustine with said
congregation, the said Reverend Augustine solicited
voluntary contributions for the erection and comple-
tion of a church building for said congregation, and
that said subscription for moneys was collected and
used in the erection of the church building in contro-
versy in this action.

"31. In the solicitation of moneys for the build-
ing of a church by the Reverend Augustine, said
Reverend Augustine stated to some of the subscribers
that such subscription was for the purpose of build-
ing a Lutheran church of the faith of the synod of
Iowa and other states.

"32. August Radka and Fred. Keil donated the
land upon which said church was erected, and that
said August Radka and said Fred. Keil were, at the
time of said donation of said lands by them to said
congregation, and at the time of the erection of said
church building, members of the said Immanuel's
Gemeinde and members of said congregation, and
during all of said times the located pastors of said
congregation were members of the Iowa synod.

"33. All of said church building, save and except
the steps and steeple to said church building, stand
upon the lands donated by said Fred. Keil.

"34. At the commencement of the erection of the
said church building there was a corner-stone cere-
mony, conducted by the Reverend Augustine, in ac-
cordance with the ceremony prescribed by the synod
of Iowa and other states for such occasions.

"35. The church building, when completed, was
dedicated at a congregational meeting by Reverend
Augustine, assisted by other ministers from the synod
of Iowa and other states.

"36. The Reverend Schedtler, of the synod of Iowa, succeeded the Reverend Augustine as pastor of the congregation.

"37. He preached for said congregation in said church building and taught parochial school in the said Rasner schoolhouse from about October, 1890, until about May, 1894.

"38. During the ministry of the said Reverend Schedtler, the said congregation received visitations from the said synod of Iowa and other states.

"39. At and prior to the commencement of this action the Rev. R. Kleinsick was president of the western division of the synod of Iowa and other states.

"40. The Reverend Kleinsick was called by the congregation, including the plaintiffs and defendants, about the 9th of April, 1894, to preside at a church trial, at which time charges were preferred by some of the members of said congregation against the pastor, the said Reverend Schedtler, and likewise charges preferred against certain members of the congregation, and he did come and preside at such church trial.

"41. In such church trial the Reverend Kleinsick made findings which were placed in the journal or protocol of the meetings of such congregation.

"42. Plaintiffs' faction, or the greater portion of them, favored the adoption and submission by the congregation to said findings, and that defendants' faction opposed the adoption of such findings. And upon such question said factions disagreed.

"43. During the time between the spring of 1885 and 1895, at such times as ministers were located by the congregation composing the Bender congregation, ministers only from the synod of Missouri, Ohio and other states were located or vocated by the said Bender congregation, and the ministers from the synod of Iowa and other states had no connection to and with the congregation meeting at the Bender schoolhouse, nor had ministers presiding over the congregation at the Bender school, in said last-mentioned times, any connection with the congregation meeting in the Rasner schoolhouse and in said church building.

" 44. The ministers of the Iowa synod presiding over said congregation had as a rule of government one to the effect that application for membership to said congregation should be announced one week prior to action being had with reference to admission upon such application.

" 45. Said Immanuel's Gemeinde congregation held its annual meeting for the election of officers on January 1, 1895.

" 46. At such annual meeting held on January 1, 1895, fourteen persons made application to join said congregation. A part of said applicants were from what was formerly known as the congregation meeting in the Bender schoolhouse.

" 47. A portion of plaintiffs' faction objected to the admission of said proposed members.

" 48. Fourteen persons were admitted as members of said congregation or to join said congregation on January 1, 1895.

" 49. On said January 1, 1895, two elders for said congregation were elected, and both of said elders were members of defendants' faction.

" 50. Peter Strecker was not an elder of said church.

" 51. Said fourteen persons who joined the congregation on January 1, 1895, belonged to the defendants' faction.

"52. Shortly before the commencement of this action, the congregation, by a majority vote of said congregation, voted to vocate (call) as its preacher for the congregation Reverend Kleinhans, who was a member of the synod of Missouri, Ohio, and other states.

"53. At and prior to the commencement of this action defendants' faction were in control of the church building and the building for parsonage, and said members of defendants' faction refused the use of said building to plaintiffs for the use, by plaintiffs, of religious service, to be conducted by one Reverend Mueller, a member of the synod of Iowa and other states, and refused plaintiffs the use of said church building, except at the time when services were conducted by the defendants.

"54. At the time when said congregation had no preacher located, and at a time when preaching was not being held by said congregation in said church, plaintiffs' faction solicited the president of the Iowa synod to send to the congregation a preacher, and in pursuance of said request said Reverend Mueller came, and the said defendants' faction refused the use of said church building to said plaintiffs for the purpose of holding religious services to be presided over by the Reverend Mueller, and that they were not permitted to hold religious services with Reverend Mueller as minister.

"55. This refusal was not on account of any charge against him, or objection to him as an individual, or that he was not a regular ordained minister of the Iowa synod of the Lutheran faith.

"56. No moneys for the building of said church were contributed by persons composing the congregation meeting in the Bender schoolhouse.

"57. Fred. Nuss, Jacob Strecker and John Fred. Steinert are, and were at the commencement of this action, the acting trustees of said congregation.

"58. There is a fundamental difference between the doctrines and tenets of faith and usages of the synod composing Missouri, Ohio, and other states, and that of the faith and doctrine of the synod of Iowa and other states, of the Evangelical Lutheran sect; both, however, claiming to be of the Evangelical Lutheran sect and denomination, the fundamental diference being with reference to election, foreordination, and as to what is the Antichrist, and as to the teachings with reference to the millenium. These differences are recognized by their respective synods as fundamental differences and teachings.

"59. At all times when the question was submitted to the congregation with reference to the joining of the synod of Iowa and other states, and during the period of time when said congregation was presided over by the ministers of the synod of Iowa and other states, the congregation voted to postpone joining the synod, and that the congregation never at any time joined the synod.''

### CONCLUSIONS OF LAW.

" 1. It is found by the court, as conclusion of law, that, as the congregation vocated ministers from the Iowa synod to teach the youth of said congregation and to preach and instruct said congregation for several years immediately prior to the building of said church and parsonage and obtaining the properties upon which said buildings are situated, and at the time that said property was obtained by it and for several years thereafter, said congregation during said times were of the Lutheran faith and doctrine preached and taught by the synod of Iowa and other states.

" 2. It is found, as conclusion of law and fact, that while the legal title to said property was in the trustees of the corporation, yet said trustees held but the naked title, and held it in use for the congregation, and that the property belonged to the congregation.

" 3. Neither party has forfeited any rights to the property.

" 4. There is nothing in the by-laws or deeds to the property to prevent the congregation from vocating (calling) a minister from any synod the congregation may choose.

" 5. Where one faction of a congregation employs a minister from a synod of a different faith from that which the congregation heretofore held, and have a right to do so, as in this case, the minority, in the exercise of the same right, adhering to the original faith and doctrines taught when said property was procured by said congregation, neither party in this case violates the trust nor forfeits any rights to the common property.

" 6. Neither faction to this suit has forfeited any rights to the property, and the members of the church being separated into two parties or factions, dividing upon religious belief and faith, yet both professing and claiming to be Lutherans in doctrine and belief, and each of said creeds or beliefs being styled as of Lutheran belief, and where, as in this case, the two factions are nearly equal in number, the property should be divided between the two factions.''

A decree was entered adjudging that the property in dispute be divided equally between the factions, and, in case said division could not be equitably had, that it be sold at public sale, as upon execution, and that the money realized be divided equally between the factions. This judgment of the district court was affirmed by the court of appeals, northern department. (8 Kan. App. 405, 54 Pac. 800.)

*H. L. Pestana,* and *Wm. B. Sutton,* for plaintiffs in error.

*Geo. W. Holland,* and *H. G. Laing,* for defendants in error.

The opinion of the court was delivered by

SMITH, J.: There was some conflict in the testimony as to whether the congregation, at the time the property was obtained, inclined toward the doctrinal teachings of the Iowa synod, yet, there being considerable testimony tending to that effect, we cannot disturb the conclusion reached by the court below that such was the fact. The controlling question in the case is whether or not the decree ordering a division or sale of the property is authorized by the rules of equity applicable to such cases. Plaintiffs in error refer to the constitution adopted in 1885, and insist that by the terms of articles 8, 13 and 15 the rule of the majority is recognized by the church organization and is equally binding upon the courts. These articles read:

"ARTICLE 8. Every member is obliged to submit to each and every word of God, and in case where the Word of God allows us freedom he is obliged to yield to the majority, and to sign this constitution."

"ARTICLE 13. Everything bought by or donated to the congregation is the property of the congregation.

Whosoever is excluded loses all claim to the property."

"ARTICLE 15. The services shall be conducted in the German language, and as long as five members adhere to this constitution the property shall be theirs."

The obligation resting on the members by article 8 to yield to the majority is invoked against the plaintiffs below, defendants in error here. The latter, until January 1, 1895, were greater in numbers. At that time the admission of those persons known as the Bender congregation, adherents of the Missouri synod, gave the faction of plaintiffs in error a majority. At that time fourteen persons belonging to what was known as the Bender-schoolhouse congregation, holding the faith of the Missouri synod, were admitted to membership without previous notice, and in violation of a rule adhered to by ministers of the Iowa synod. The chairman of the meeting at which said persons were admitted was not an elder, and consequently acted in violation of the spirit of article 10 of the by-laws.

The defendants in error, shortly before the commencement of the action, at a time when there was no minister in charge, solicited the president of the Iowa synod to furnish a preacher. Reverend Mueller was sent from the Iowa synod in pursuance of that request. The faction of plaintiffs in error was in control of the church buildings, and refused to permit Reverend Mueller and his followers, adherents of the Iowa synod, to use the same for religious services. About this time the majority procured the services of Reverend Kleinhans, of the Missouri synod, against the wishes of the minority, and installed him as pastor of the church. It is probable that the methods employed by the plaintiffs in error, by which they se-

cured a voting majority, would have been condemned by a supervising tribunal of the church, had one existed to review the proceedings. From the date of the adoption of the constitution, in 1885, to and including the year 1894, during which time the real estate upon which the church was built was donated, ministers from the synod of Iowa acted as pastors of the congregation, and during this time voluntary contributions were solicited and received sufficient in amount to build the meeting-house in controversy.

Under article 15 of the constitution, as long as five members adhered thereto the property was to be theirs. Both factions, being about equal in number, claimed to have adhered to the constitution, and the court found that neither party had forfeited any rights in the property. Neither faction, then, having forfeited any rights, and there being irreconcilable differences between them, do the rules of equity require that the property should be divided? It will be noticed that this church is independent. There was no ecclesiastical tribunal superior in authority to which controversies concerning faith and doctrine could be submitted for settlement. If such higher authority existed, courts would remand the adjustment of such difficulties to the church tribunal, where they rightfully belong. Here, no member of the congregation having forfeited any property rights, and the church being disrupted and torn with internal strife, seemingly irrepressible, what is the equitable thing to be done?

It would be manifestly unfair, in the face of the findings of the court, to hold that the faction represented by the plaintiffs in error may keep possession of the church property and perpetually dedicate it to the teaching and advancement of the doctrines of the

Missouri synod when the donors of the land on which the church was built were adherents of the Iowa synod, and the minister in charge at that time, at whose solicitation funds were contributed for the erection of the building, was teaching the same belief. (*Baker v. Ducker*, 79 Cal. 365, 21 Pac. 764; *Wheelock v. First Presb. Church*, 119 .Cal. 477, 51 Pac. 841; *Attorney General v. Pearson*, 3 Merrivale, 353.)   The doctrines of the Missouri and Iowa synods are fundamentally different.   The trial court found:

"58.  There is a fundamental difference between the doctrines and tenets of faith and usages of the synod composing Missouri, Ohio, and other states, and that of the faith and doctrine of the synod of Iowa and other states, of the Evangelical Lutheran sect; both, however, claiming to be of the Evangelical Lutheran sect and denomination, the fundamental difference being with reference to election, foreordination, and as to what is the Antichrist, and as to the teachings with reference to the millenium.   These differences are recognized by their respective synods as fundamental differences and teachings."

If the plaintiffs below, among whom were the donors of the land aforesaid, were here asserting that the use of the church property should be devoted to the dissemination only of that faith held by the Iowa synod, we would be inclined, under the findings, to sustain their claim.   There has, however, been a decree entered in their favor at their suit which they insist should be upheld, viz., that the property be sold and the proceeds divided among the congregation.   Unimportant as the differences in faith between the two factions of this church may seem to others, they appear irreconcilable and permanent so far as the contending factions are concerned, each side regarding its creed as the true one, vitally essential,

and adherence thereto necessary to the attainment of eternal salvation.

The plaintiffs in error insist that the incorporation of the church is an insuperable obstacle in the way of the division of its property among the members. We cannot agree with them in this contention. In *Winebrenner et al. v. Colder et al.*, 43 Pa. St. 249, 252, it is said : " The legislature never means, by granting or allowing such charters, to change the *ecclesiastical* status of the congregation, but only to afford them a more advantageous *civil* status." ( See, also, *Wheelock v. First Presb. Church*, supra.) In *Brunnenmyer et al. v. Buhre et al.*, 32 Ill. 184, 190, we find the following :

" By the election which organized the corporation, the title became vested in the trustees and their successors, for the use of the trust, as completely as if the use had been declared by deed. . . . A trust of this character is not distinguishable in this from any other trust over which courts of chancery exercise a supervisory power."

In the case of *Ferraria et al. v. Vasconcellos et al.*, 31 Ill. 25, 56, which was a case quite similar to the one at bar, Chief Justice Caton used this language :

" In a case thus peculiar in its facts, differing as it does from all others which we find reported, where neither party has incurred a forfeiture, we are to apply the rules of equity and a sound morality. This can only be done by a division of the property, where the members of the church have thus become divided in numbers nearly equal.

" We would not be understood that such a division should be made where one party or the other consisted of a single member, or but a very few members, for then the minority might be considered as acting obstinately or perversely ; but where, as in this case, the numbers are nearly equal, there is propriety in recognizing the rights of each." ( See, also, *Niccolls et al. v. Rugg et al.*, 47 Ill. 47.)

The court below adjudged the sale of the real estate and all the personal property, to be sold as upon execution, the proceeds to be first applied to the payment of costs, and the residue to be divided equally between the plaintiff and defendant factions of said congregation. In order that the property may not be diverted from the religious purposes for which it has been dedicated, but be preserved for church purposes, as expressed in one of the deeds, we think the privilege of purchasing should be reserved to the two factions in the church, and that whichever, upon the sale, offers to pay the higher price, should be entitled to exclusive ownership. This was done in the case of *Niccolls et al. v. Rugg et al.*, supra, and was considered a proper and equitable method of disposing of the property. If neither sees fit to purchase, then the sale should be opened to all bidders.

The judgment of the court of appeals and of the district court will be affirmed in all respects, except that it will be modified in accordance with the views expressed herein so far as relates to the order of sale of the property.