# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-01843-SCT

### *REVEREND JESSIE L. SAWYER AND EBERNEZER MISSIONARY BAPTIST CHURCH*

*v.*

### *EZELL BRANDON, ROBERT WILSON, SAM STRAUGHTER, WILLIE SMITH, JAMES HILL AND FRANKIE L. QUINN*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/24/2000 |
| TRIAL JUDGE: | HON. JOHN C. ROSS, JR. |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | CHARLES E. MILLER |
| ATTORNEYS FOR APPELLEES: | GEORGE S. WHITTEN, JR. |
| | T. K. MOFFETT |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: AFFIRMED - 8/29/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/19/2002 |

**BEFORE PITTMAN, C.J., COBB AND CARLSON, JJ.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. Alarmed by the pastor's use of the church phone for long distance calls, the pastor's prior felony conviction, the pastor's failure to remove himself from office after verbally submitting his resignation, and the pastor's attempted use of the church van for a personal trip, six ex-deacons of the Ebernezer Missionary Baptist Church[(1)] filed for injunctive and other relief against the pastor in the Chancery Court of Monroe County. The pastor answered and filed a counterclaim against the National Bank of Commerce seeking control of the funds in the church's bank account. The bank interpled the funds into court, and the chancellor asserted jurisdiction over the action. After three days of hearings, the chancellor refused to determine who had control over the church funds. He ruled that the church should decide the matter of

ownership through a resolution passed during a congregational meeting. The chancellor refused once more to determine the ownership of the funds after finding the entire church, including the plaintiffs, had not been present to vote on the matter. This Court denied permission to take an interlocutory appeal, and the chancellor concluded that the church was split into two factions at irreconcilable odds with one another. What started out as a suit to prohibit the pastor from returning to the church expanded to include ownership of the church grounds, van, furniture, and all other church property. The chancellor ordered the church's property sold at a closed auction where the two sides were the only bidders. The group headed by the plaintiff ex-deacons submitted the winning bid for both the church's real property and van, and the proceeds of the sale were divided between the two groups. From this result, the pastor, Rev. Jessie L. Sawyer, appeals and cites one issue for this Court's examination:

> **WHETHER THE CHANCELLOR ERRED IN DETERMINING THAT THE EBENEZER MISSIONARY BAPTIST CHURCH BUILDING AND PROPERTY SHOULD BE SOLD TO THE HIGHEST BIDDER AT AN AUCTION.**

The ex-deacons respond to this issue in their first issue:

> **I. WHETHER THE CIVIL COURT PROPERLY EXERCISED JURISDICTION OVER THIS PROPERTY DISPUTE ARISING IN AN ECCLESIASTICAL CONTEXT.**

The ex-deacons also cite two more issues in support of their position that the chancellor's order to sell the property was within the court's power:

> **II. WHETHER THE CHANCERY COURT'S FACTUAL FINDINGS THAT ATTENDING EBERNEZER CHURCH POSED A DANGER TO LIFE AND LIMB AND THAT THE FACTIONS WERE IRRECONCILABLE AND UNABLE TO FUNCTION AS ONE CONGREGATION WERE SUPPORTED BY SUBSTANTIAL EVIDENCE.**

> **III. WHETHER A CHANCERY COURT POSSESSES THE POWER, IN EQUITY, TO LIQUIDATE CHURCH ASSETS FOR THE PURPOSE OF DISTRIBUTING THE PROCEEDS BETWEEN FACTIONS IRRECONCILABLY OPPOSED AND REFUSING TO FUNCTION AS ONE CONGREGATION.**

They also ask this Court to address one issue on cross-appeal:

> **IV. WHETHER, UNDER THE WARRANTY DEED, THE SAWYER FACTION FORFEITED ALL INTEREST IN THE REAL PROPERTY BY CEASING TO OPERATE AS EBERNEZER MISSIONARY BAPTIST CHURCH AND ADOPTING A NEW NAME.**

## FACTS

¶2. Reverend Jessie L. Sawyer (Rev. Sawyer) was called to be the pastor of Ebernezer Missionary Baptist Church (the church) in May of 1996. The church is over one hundred years old and holds worship in the Gibson community in a church building in western Monroe County off Highway 8. Ezell Brandon-the chairman of the Board of Deacons, Robert Wilson, Sam Straughter, Willie Smith, James Hill, and Frankie L. Quinn (corporately, the "ex-deacons"), along with Jimmy Pargo, were the seven deacons comprising the Board of Deacons of the church when the conflicts with Rev. Sawyer began to surface. At the beginning of Rev. Sawyer's tenure, the church was thriving. Approximately 200 people attended worship services once

a week. Four Sunday School classes were being taught.

¶3. Over the course of the two years after Rev. Sawyer became pastor, the church slowly slipped into disharmony. The congregation suffered from the conflicts between the Board of Deacons and Rev. Sawyer. These conflicts became divisive in the early part of 1998 when the ex-deacons made their displeasure with the ballooning costs of the long-distance charges on the church's telephone bill known to Rev. Sawyer. Another point of conflict was the newly-discovered fact that Rev. Sawyer had pleaded guilty in 1993 to federal felony charges of forging money orders while working at the Mississippi State Penitentiary at Parchman. Attendance at the church dropped. The average attendance at the weekly worship service was down to approximately eighty people. Only one Sunday School class was being taught. In March of 1998, Rev. Sawyer announced to the church that he would resign in ninety days. When the ninety days were up, Rev. Sawyer refused to vacate his office. This became another point of conflict between the deacons and their pastor, and members of the congregation began to take sides.

¶4. The conflict between the deacons and Rev. Sawyer reached its apex when the Board of Deacons refused to give Rev. Sawyer permission to take the church van to a family reunion in Illinois in July of 1998. That Sunday, Rev. Sawyer called a church meeting after the worship service concluded and gained the approval of the congregation, by vote of the members present, to take the church van to Illinois for the reunion. During that week, before Rev. Sawyer left, the van disappeared. Rev. Sawyer and deacon Pargo accused ex-deacon James Hill of stealing the van which resulted in Hill's arrest and incarceration for one night.[2] The following Sunday, another meeting was announced for the forthcoming Saturday. It was during the Saturday meeting on August 1, 1998, that all the deacons were removed from office, including Pargo.[3] Two weeks later, Pargo was reinstated to his position, and Rev. Sawyer was "re-elected" pastor of the church. The Wednesday following their removal, the ex-deacons filed suit to have Rev. Sawyer enjoined from coming on the church premises and have him return the church van, which was apparently still missing.

¶5. By the time the chancellor conducted hearings on the matter in September of 1998, attending worship services at the church was a dangerous proposition. Some members chose to stay away from the church. Threats of violence against ex-deacons, members of the congregation, and Rev. Sawyer flew back and forth. The Monroe County Sheriff's Department responded to a few complaints from the church concerning confrontations on church grounds. The Sheriff himself testified to responding to one such call. Offers to mediate between the parties were rebuffed, and the locks on the church doors were changed on different occasions by the different groups.

¶6. After three days of raucous hearings, the chancellor found that he had jurisdiction over the ex-deacons' suit. He made this determination based upon the fact that the National Bank of Commerce had responded to Rev. Sawyer's counterclaim seeking control of the church finances by interpleading the funds in the church's accounts into the lawsuit. He ordered the congregation to hold a meeting and determine whether the ex-deacons had been removed from office legitimately, whether Rev. Sawyer remained as pastor of the church, and who among those groups was the rightful trustee of the funds in the church's bank accounts. Two attempts at resolving this dispute failed. The first meeting erupted in discord, in the presence of two security guards no less, and no decision was made. The chancellor found the result of the second meeting unsatisfactory as members of the group supporting the ex-deacons were not present to vote, presumably to avoid physical altercations.

¶7. Over a year-and-a-half later, in light of the awful state of affairs that existed at the church, the chancellor

brought the parties back to court after the ex-deacons filed a petition to determine the ownership and control of the church grounds. The chancellor divested the church of ownership of all real and personal property and ordered the chancery clerk to sell them to the highest bidder at an auction where representatives from both parties were the only bidders. The auction was conducted, and the group supporting the ex-deacons submitted the highest bid for the church premises and van.[4] The church's real estate had been titled to "Robert Wilson, Chairman, Sam Straughter, Willie E. Smith, James Hill, Jimmy Pargo and Ezell Brandon, Trustees of Ebenezer M. B. Church, and its successors in office." The church van had been titled to "Ebenezer MB Church." The results of the auction were set aside by the chancellor after the group supporting Rev. Sawyer objected to the method of payment. The chancellor ordered the auction conducted again, and the ex-deacons once again submitted the highest bid for both properties. Rev. Sawyer appeals this action taken by the chancellor.

## DISCUSSION

### WHETHER THE CHANCELLOR ERRED IN DETERMINING THAT THE EBENEZER MISSIONARY BAPTIST CHURCH BUILDING AND PROPERTY SHOULD BE SOLD TO THE HIGHEST BIDDER AT AN AUCTION.

¶8. Although the language of the above issue is more expansive, Rev. Sawyer's only objection, according to his brief, is the chancellor's assertion of jurisdiction over this matter. He asserts that since the court did not have jurisdiction, it did not have the power to order the sale of the property. He refers this Court to *Grantham v. Humphries*, 185 Miss. 496, 188 So. 313 (1939), where the chancellor dismissed a suit filed by an ousted faction of a church. That faction of the church sought injunctive relief allowing them use of the church building and allowing the dismissed pastor to hold services there. *Id.* at 499, 188 So. at 313. This Court affirmed the chancellor's dismissal of the suit explaining: "The question involved is ecclesiastical and not one for the civil courts. The church authorities and such tribunals as they may set up for themselves are supreme in such matters. Their decision is final as to who shall be the pastor and other officers. Such disputes are ecclesiastical in their nature and the courts have no control over them." *Id.*

¶9. Rev. Sawyer also points to *Windham v. Ulmer*, 102 Miss. 491, 59 So. 810 (1912), in support of his argument that the chancellor in the instant case should not have asserted jurisdiction over the matter. There, a chancellor asserted jurisdiction over a dispute between two factions of a church where an ousted faction sought injunctive relief allowing them access to the church building for worship services. *Id.* at 494, 59 So. at 810. The chancellor granted the requested injunctive relief after finding that the entire congregation of the church had voted on a resolution allowing the ousted faction the relief they were seeking. The other faction had secretly met the day after the congregational meeting, rescinded the resolution, and changed the locks on the church doors. *Id.* at 495, 59 So. at 810. After recognizing that the trial court was without power to independently rule on the issue, this Court affirmed the chancellor's ruling because the matter had been resolved by the whole church at the congregational meeting. It stated the church's decision "should be accepted by the civil courts, and control, unless it should be shown that, at a subsequent regular meeting, held in accordance with the rules and regulations of the church, the action of the conference mentioned was rescinded and set aside and other disposition made of the matter." *Id.* at 496, 59 So. at 810.

¶10. Finally, Rev. Sawyer points to *Dees v. Moss Point Baptist Church*, 17 So. 1 (Miss. 1895), where this Court lamented the expulsion of a loyal and devoted Baptist deacon from the church to which he had devoted his time and resources for its establishment and building of its sanctuary. *Id.* This Court, however,

refused to reinstate him to his position, stating "Its [the church's] determination of questions of doctrine and discipline is exclusive and final. There is no appeal to any superior ecclesiastical court, and over things spiritual or ecclesiastical the civil courts, ordinarily, may not take jurisdiction." *Id.* at 2.

¶11. The ex-deacons respond that once the church funds were interpled into the suit, the chancellor had jurisdiction over the whole matter. The chancellor reached this conclusion. The ex-deacons refer this Court to *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200 (Miss. 1998), where this Court stated, "Civil courts have the general authority to resolve the question of church property ownership." *Id.* at 204 (citing *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). The courts, however, cannot resolve property disputes by inquiring into and resolving disputed issues of religious doctrine and practice. *Id. Accord*, *Shirley v. Christian Episcopal Methodist Church*, 748 So. 2d 672, 675 (Miss. 1999).

¶12. The chancellor considered *Church of God Pentecostal, Inc.* when ruling on this matter preliminarily. He even cited the case in his order to have the congregation meet and decide who controlled the funds in the church bank accounts:

> From the proof which the Court has heard so far in this case, after three days of hearings already conducted, there can be no question to the Court that this dispute is one that pertains to Ebernezer Missionary Baptist Church's religious doctrine and practice.

> The key dispute is whether Reverend Jesse L. Sawyer remains as Pastor of Ebernezer Missionary Baptist Church; Ezell Brandon, Robert Wilson, Sam Straughter, Willie Smith, James Hill, Frankie Quinn and Jimmy Pargo remain as Deacons of Ebernezer Missionary Baptist Church.

> This dispute must be resolved by the church and cannot be litigated in the courts of the state of Mississippi, more specifically the Chancery Court of Monroe County. The Mississippi Supreme Court has made this abundantly clear in the recent case dated June 4, 1998, styled: Church of God Pentecostal, Incorporated v. Freewill Pentecostal Church of God, Incorporated, and cited at 1998 WL 286061.

> . . . .

> Thus this Court takes the position that it cannot and will not resolve the issue of the pastor and deacons. That issue must be resolved by a membership vote of the church.

> The Court does find, however, that by virtue of the National Bank of Commerce of Mississippi's interpleader, all church funds which this Court now holds and will continue to hold, gives this Court continuing jurisdiction over this case.

After two efforts by the church to resolve the issue of who is pastor and who are deacons were unsuccessful, the chancellor concluded in a later opinion:

> The great controversy here is a dispute between two factions within the Ebenezer Missionary Baptist Church for control of the church's assets, namely real property, personal property, furniture, appliances and fixtures, a van and approximately $90,000 in cash (which has been previously frozen by this Court).

Both factions claim to adhere to the practices and doctrines of the Missionary Baptist faith. The proof presented at several hearings held in this matter clearly indicate that there is total disagreement as to what rules, regulations and doctrines apply. There is also total disagreement as to which faction properly governs the operation of the church, including employment or termination of the pastor, deacons, trustees and other officials of the church. There is total disharmony as to the management, control and maintenance of the church's real and personal property.

. . . .

However, it is a very volatile situation. The hearings have established that some members attending church services and meetings carry fire arms; ugliness and violence has erupted to the extent that the Monroe County Sheriff's Department has been called to the church on several occasions. If permitted to continue unchecked, a very serious incident involving bodily harm or even death could potentially occur.

Since the original pleadings were filed on August 5, 1998, every effort, including court appearances, negotiations, conferences, and temporary orders by this Court, has failed to resolve the controversy. An observer could only conclude that matters have substantially worsened over time with no peaceful, voluntary resolution in sight. The time has now arrived for some step to be taken by the Court to resolve this matter.

This Court readily acknowledges that it has no authority whatsoever to delve into an attempt to adjudicate matters of religious doctrine or theology. In a previous judgment entered October 8, 1998, this Court cited *Church of God Pentecostal, Incorporated v. Freewill Pentecostal Church of God, Incorporated*, 716 So. 2d 200 (Miss. 1998) in recognition of this limitation.

The Court does find that the above cited case allows the trial court to address matters of property within the church.

Because of the total impossibility of a peaceful resolution by the membership of the church, the restriction on the courts of this state to resolve matters of religious practice and, even more importantly, to prevent future violence and possible bloodshed, this Court must address the property issue to resolve this terrible dispute.

There is before the Court a petition to determine ownership and control of real property filed on February 14, 2000 by the plaintiffs. The defendant filed responses to the petition of the plaintiffs. Both pleadings call upon this Court to invoke and interpret church doctrine (which is also in dispute by the parties). The Court cannot grant the specific relief requested by either side.

The Court does find that under its equitable powers, specifically pertaining to church property, it can order a sale of all church assets. After the sale, the proceeds could then be divided between the parties and each go their separate way and establish a church of their choice.

Accordingly, this Court does hereby divest title to all of the real and personal property held in any fashion for use by Ebenezer Missionary Baptist Church and vests the titles to same in (the Chancery Clerk of Monroe County), as special commissioner.

The chancellor's frustration with the situation originated with the church's procedure for conducting business.

¶13. The ex-deacons asserted at the hearings that the church followed a set of rules, "The Constitution and Bylaws Customarily Used By Black Baptist Churches," promulgated by the Moderator of the North Mount Olivet Baptist District Association. However, they could not produce documentation to the effect that the rules had been ratified by the congregation at the church. The ex-deacons' witness, the former church clerk, testified that while some of the congregation's rules differed from the district rules, it was customary to abide by the district rules. She mentioned a second set of rules which she claimed the church had adopted.[(5)] However, except for ex-deacons Smith and Wilson, no one at the church had seen this second set of rules. The church clerk also identified a church covenant which stated that where a unanimous decision could not be reached, the right of the majority to govern will be recognized.

¶14. This covenant highlights the voting and governing procedure at the church. The church kept a roll of its members. A modified list of these names was introduced into evidence by the church clerk at the hearing as those qualified to vote under a church rule. However, no accounting was made before any votes were taken of who was present and eligible to vote. Practically speaking, if a worshiper remained past the service or attended the meeting on Saturday and was seen frequently enough at the church, his vote was counted. There was no set quorum of members needed to be present for a vote to be official. Other than noting whether a voter was of age when counting the votes, no inquiry was made into whether the voter was eligible to cast the vote, and no records were kept of the number of members present and abstaining.

¶15. The calling of Rev. Sawyer as pastor well illustrates the church's voting method. There, twenty-one people voted to call him as pastor without dissent, but many present refused to vote. This occurred in a congregation composed of around 200 members at the time. Another example is the August 1 meeting where the ex-deacons were removed from office. Only thirty-two members were present to vote the ex-deacons out of office. However, the deacons later produced a list of about 100 supporters. Those present at congregational meetings were apparently an ecclesiastical law unto themselves.

¶16. Rev. Sawyer testified that the Mount Olivet Baptist District Association, whose moderator promulgated "The Constitution and Bylaws Customarily Used By Black Baptist Churches," had no control over how the church conducted its business. He testified that each Baptist church is a sovereign church. Rev. Sawyer equivocated on whether the church needed grounds to dismiss a deacon. He stated that the deacons control the day to day business, but their actions also required approval by the congregation.

¶17. The chancellor wisely declined to become ensnared in the controversies regarding membership and voting as these were certainly ecclesiastical matters. *See Blue v. Jones*, 230 So. 2d 569 (Miss. 1970). Indeed, at the outset, the facts of this case are very similar to those in *Blue*. There, the deacons of a Missionary Baptist Church were removed from office by a majority group of members of the congregation led by its pastor. *Id.* at 659. The congregation had passed a resolution removing the deacons, and they attached the resolution to their answer to the lawsuit filed by the deacons who were removed. *Id.* The chancery court overturned this resolution finding the action had not been lawfully done. This Court unanimously reversed the chancellor's ruling, finding that determining the officers and trustees of the church was an ecclesiastical question. This Court stated, "The government of a Baptist Church is congregational and democratic, with each church a distinct organization, independent of others. The members of the church have full power to call a pastor and elect property trustees and deacons." *Id.* at 570. This Court also found that the ex-deacons needed a majority of the congregation to vote to authorize them to bring this suit, and such authorization had not been obtained. *Id. Accord*, *Grantham*, 185 Miss. 496, 188 So. 313.

¶18. This issue, however, can be resolved by recognizing its dual nature. The initial complaint asked the chancellor to grant injunctive relief. However, once control of the funds in the church's bank accounts became an issue, a question of ownership of those funds was sufficient to bring that part of the conflict under the chancery court's jurisdiction.

¶19. We therefore conclude that the chancellor properly asserted jurisdiction over the lawsuit as it pertained to the ownership and control of the church property. The court acquired jurisdiction over this suit after control over the interpled funds became an issue. The chancellor also wisely chose to refrain from determining whether Rev. Sawyer was the pastor and whether the ex-deacons were properly removed. However, we are troubled by the chancellor's order divesting ownership of the real and personal property from the church. We find this remedy to be inappropriate in light of our law as explained below. Therefore, we will continue in our discussion of this case in the format submitted by the ex-deacons.[(6)]

### II. WHETHER THE CHANCERY COURT'S FACTUAL FINDINGS THAT ATTENDING EBERNEZER CHURCH POSED A DANGER TO LIFE AND LIMB AND THAT THE FACTIONS WERE IRRECONCILABLE AND UNABLE TO FUNCTION AS ONE CONGREGATION WERE SUPPORTED BY SUBSTANTIAL EVIDENCE.

¶20. The ex-deacons assert that the appropriate standard of review is whether the chancellor's findings of fact are supported by substantial evidence. This Court will not overturn those findings unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Church of God Pentecostal, Inc.*, 716 So. 2d at 204. No party is questioning the chancellor's findings of fact. We find them to be an accurate accounting of the troubles at the church and the church's inability to solve those problems. There is no issue to resolve here. The chancellor cited the applicable standard of review in his opinions, and it is clear that he used the correct legal standard.

### III. WHETHER A CHANCERY COURT POSSESSES THE EQUITABLE POWER TO FORCE THE SALE OF CHURCH ASSETS AND DISTRIBUTE THE PROCEEDS BETWEEN FACTIONS WHICH ARE IRRECONCILABLE AND UNABLE TO FUNCTION AS ONE CONGREGATION.

¶21. The ex-deacons refer this Court to other jurisdictions where the courts have ordered a sale of church property at auction between the two factions of the church. *Immanuel's Gemeinde v. Keil*, 58 P. 973 (Kan. 1899), the trial court ordered the sale of church property at public auction where the factions struggling for control of the property of the church were divided into groups of almost equal size: one group adopting new tenets of faith to be preached at the church while the other wishing to continue as before. *Id.* at 978. The Supreme Court of Kansas affirmed the trial court's order but restricted the auction participants to representatives of the two groups. *Id.* Cited in this decision and offered as another case in support of the ex-deacons' argument is *Nicolls v. Rugg*, 47 Ill. 47 (1868). There, when confronted with a minority of church members wishing to remain in the old school of the Presbyterian faith, the trial court ordered the sale of the church property at auction attended only by representatives of the two factions. *Id.* The Illinois Supreme Court affirmed this ruling of the trial court. *Id.*

¶22. Finally, the ex-deacons cite and attempt to distinguish *LeBlanc v. LeMaire*, 30 So. 135 (La. 1901). There, a small minority of church members attempted to have the trial court partition the church property after the pastor they favored was removed from office. *Id.* at 136. The trial court refused to do so and was affirmed on appeal after the court concluded that the church operated by majority rule and the majority had

resolved the issue of who was to be the pastor. *Id.* at 137. The ex-deacons say this case does not apply because the congregation was not equally divided. They conclude that these cases stand for the proposition that the chancellor's equitable powers enabled him to order the property sold at auction.

¶23. We are unable to find a case in Mississippi where the same relief was awarded. However, this Court has adopted the United States Supreme Court's view that neutral principles of law can be used without resolving disputes of an ecclesiastical nature when determining property ownership. *Church of God Pentecostal, Inc.*, 716 So. 2d at 205 (citing *[Jones v.] Wolf*, 443 U.S. at 602, 99 S.Ct. 3020). This Court explained:

> This method, as enunciated by the United States Supreme Court in *Blue Hull*, relies on objective, traditional concepts of trust and property law familiar to attorneys and judges. It calls "for completely secular examination of deeds to the church property, state statutes and existing local and general church constitutions, by-laws, canons, Books of Discipline and the like to determine whether any basis for a trust in favor of the general church exists.

*Church of God Pentecostal, Inc.*, 716 So. 2d at 205 (citations omitted). *Church of God Pentecostal, Inc.* and *Shirley* dealt with property disputes between a local congregation and its national overseeing body. These two cases are this Court's most recent opinions on church schisms. *Jones v. Wolf*, the United States Supreme Court opinion upon which both Mississippi cases rely, addressed the problem of which faction controlled church property where a higher ecclesiastical authority existed. However, these cases apply as well to church schisms where no binding higher authority exists and the principles contained within them should be applied to factual situations like the present one.

¶24. As stated above, the deed to the church real estate was marked as an exhibit and reads in relevant part as follows:

> For and in consideration of the sum of Two Thousand Dollars ($2,000.00), cash in hand paid, the receipt and sufficiency of which is hereby acknowledged we . . . convey and warrant unto Robert Wilson, Chairman, Sam Straughter, Willie E. Smith, James Hill, Jimmy Pargo and Ezell Brandon, Trustees of Ebenezer M. B. Church, and its successors in office, the following described real property located and situated in Monroe County . . . [description of church grounds].

The warranty deed, on its face, created a trust in favor of the church and named many of the plaintiff ex-deacons in this suit as trustees. The title to the church grounds is to pass to their successors in office as trustees. The church van was also titled in the name of "Ebenezer MB Church." The former church clerk agreed in her testimony at the hearing that the deacons kept possession of the church van in trust for the entire church.

¶25. By way of review, all the deacons of the church were removed from office August 1, 1998, by vote of the members that were present. "The Constitution and Bylaws Customarily Used by Black Baptist Churches" provides:

> The deacons shall assist the pastor in promoting the spiritual welfare of the church, in organizing and developing its strength for the best possible service, and in conducting the religious services and all other work of the church. They shall make proper provision for the observance of the ordinances of the church, serving the elements of the Lord's Supper, with the pastor. They shall assist the pastor in

home visitation and all other efforts; assist in securing the funds necessary to maintain and advance the work of the church. The deacons shall serve as trustees of the church.

During Rev. Sawyer's testimony, he stated that he used The Baptist Standard Church Directory as a reference for his powers. This book provides the following concerning trustees:

These officers are necessary only because state laws require them for holding titles to the property of the church. They must execute legal papers in the name of the church when a purchase, transfer or sale has been ordered by the authority of the church. They are the custodians of church papers and titles, but can only exercise the power vested in them by vote of the church. Trustees should be elected annually by the church. This election usually takes place in December, and an effort is made to secure prudent, intelligent business men for this important office. They may be members of the Deacon Board as well, and some authorities hold that they should be. However, it is not a good practice for any one man to hold too many offices; it is a temptation for him to assume the authority of a dictator, as many a pastor has found to his sorrow. While in some sections of the country state laws do not require trustees for churches, in other states the churches can only have the protection and rights of corporate bodies through their trustees. It is not out of place therefore, to stress the fact the records of the Trustee Board be kept with the utmost care and accuracy.

We therefore conclude that both documents create two offices or functions: that of deacon and that of trustee. Under "The Constitution and Bylaws Customarily Used by Black Baptist Churches," the deacons are not excluded from being a trustee. The Baptist Standard Church Directory and Busy Pastor's Guide makes much of these offices being separate and distinct, but does not preclude deacons from being trustees as well. From our reading of these two documents, we conclude that removal from one office does not automatically constitute removal from the other.

¶26. Regardless of whether the plaintiffs and deacon Pargo were properly removed from office as deacons, we find that the title to the church property was still vested with those men serving as trustees for the church. We are not concerned with who holds the office of deacon presently. The title to these properties lies appropriately with whomever holds the office of trustee. The chancellor erred in divesting the title to the property of the church from the church as there are identifiable trustees of the church's property. Parenthetically, we endorse the appointment of property trustees in congregational churches. *See* Miss. Code Ann. § 79-11-31 (2001).

### IV. WHETHER UNDER THE WARRANTY DEED, THE SAWYER FACTION FORFEITED ALL INTEREST IN THE REAL PROPERTY BY CEASING TO OPERATE AS EBERNEZER MISSIONARY BAPTIST CHURCH AND ADOPTING A NEW NAME.

¶27. Anticipating that this Court may reach the conclusion that the chancellor did err in his handling of this case, the ex-deacons offer the Court grounds to award them control of the church's property. Their contention is that when all the deacons were removed, the faction which represents the church as it existed before the break should maintain control of the property, especially where the other faction has taken steps to operate under a different name. The chancellor was never presented the opportunity to rule on this issue cited by the ex-deacons. Instead, they ask this Court to award them, sua sponte and out-of-time, the possession of the church property. Such an action is inappropriate, and this cross-appeal issue is without merit.

<u>**CONCLUSION**</u>

¶28. Although the chancellor was confronted with a bad situation involving physical violence between two factions of a church with no hierarchical authority to appeal to for resolution of a property dispute, the chancellor's resolution of the problem was erroneous. While he did properly have jurisdiction over the subject matter of the lawsuit, namely the interpled funds from the church's bank accounts and eventually the entire body of real and personal property belonging to the church, his solution for the property dispute is in conflict with the law. This Court's opinions stating that neutral principles of law should be applied to determine who controlled the money and ultimately the property should have been applied in this case. Therefore, the chancellor's order divesting ownership of the property from the church and ordering it sold at an auction is reversed, and this case remanded for further proceedings consistent with this opinion to determine the true ownership of the property.

¶29. **ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: AFFIRMED.**

> **SMITH, P.J., COBB, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. WALLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. EASLEY, J., NOT PARTICIPATING.**

> **WALLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶30. I agree with the majority that the chancellor correctly refrained from deciding the issues regarding which faction of the church should prevail and that the chancellor properly asserted jurisdiction over the lawsuit as it pertained to the ownership and control of the church property. However, I disagree with the majority's conclusion that the chancellor's order divesting ownership of the real and personal property of the church was improper.

¶31. The chancellor was faced with an impossible situation that included threats of violence, bitterness and hatred between the members of the congregation and unyielding viewpoints. It was evident that the congregation would never resolve their problems. The chancellor fashioned the best remedy possible under the circumstances. He was empowered to make that decision by the rules of equity. As we have stated:

> The remedial powers of our chancellors are sufficient to vindicate the claims and interests of all litigants. Those powers are as broad as equity and justice require. Those powers have always been marked by flexibility and expansiveness so that appropriate remedies may be decreed to satisfy the needs of the particular case. The chancellor's remedial powers are marked by plasticity. Equity jurisdiction permits innovation that justice may be done. That there is no precedent for the precise relief sought is of no consequence.

> Courts of equity have all remedial powers necessary to the particular case, except those that are expressly forbidden by law. Accordingly, we look to our law to see if impression of a lien to enforce compliance with an injunction is a power forbidden to the chancellor by our law. We find no statutory or decisional impediment to such power, nor is there apparent in juridical logic any rationale under which this power ought be denied our chancellors.

*Hall v. Wood*, 443 So. 2d 834, 842-43 (Miss. 1983) (citation omitted).

¶32. The chancellor did not exercise a power forbidden to him by our law. He had the power to decide the ultimate disposition of the property. Therefore, I would affirm the chancellor's decision to force the sale of the property of the church.

**DIAZ, J., JOINS THIS OPINION.**

1. Ebenezer is spelled two ways throughout the record: Ebenezer or Ebernezer. We minimize the use of that word, but use the spelling found in the record where it is necessary to quote from it.

2. It was disputed whether Hill hid the van intentionally or had merely taken it to be serviced.

3. The church clerk and the chairman of the usher board were also removed from office.

4. These were the only two items sold at the auctions. The other objects of personal property such as a computer and furniture were not sold. The chancellor was informed of this fact, and a list of other items was supposed to be submitted to the court but never was. Apparently whoever had possession of the other property at the conclusion of this matter was awarded ownership.

5. This document was not entered into evidence.

6. No reply brief was filed by Rev. Sawyer, and he did not respond to the issue on cross-appeal.