*176 CHIEF Justice Roberts
delivered the opinion of the Court.
Certain employment discrimination laws authorize em­ployees who have been wrongfully terminated to sue their employers for reinstatement and damages. The question presented is whether the Establishment and Free Exercise Clauses of the First Amendment bar such an action when *177 the employer is a religious group and the employee is one of the group’s ministers.
I
A
Petitioner Hosanna-Tabor Evangelical Lutheran Church and School is a member congregation of the Lutheran Church — Missouri Synod, the second largest Lutheran de­nomination in America. Hosanna-Tabor operated a small school in Redford, Michigan, offering a “Christ-centered edu­cation” to students in kindergarten through eighth grade. 582 F. Supp. 2d 881, 884 (ED Mich. 2008) (internal quotation marks omitted).
The Synod classifies teachers into two categories: “called” and “lay.” “Called” teachers are regarded as having been called to their vocation by God through a congregation. To be eligible to receive a call from a congregation, a teacher must satisfy certain academic requirements. One way of doing so is by completing a “colloquy” program at a Lutheran college or university. The program requires candidates to take eight courses of theological study, obtain the endorse­ment of their local Synod district, and pass an oral examina­tion by a faculty committee. A teacher who meets these requirements may be called by a congregation. Once called, a .teacher receives the formal title “Minister of Religion, Commissioned.” App. 42, 48. A commissioned minister serves for an open-ended term; at Hosanna-Tabor, a call could be rescinded only for cause and by a supermajority vote of the congregation.
“Lay” or “contract” teachers, by contrast, are not required to be trained by the Synod or even to be Lutheran. At Hosanna-Tabor, they were appointed by the school board, without a vote of the congregation, to one-year renewable terms. Although teachers at the school generally per­formed the same duties regardless of whether they were lay or called, lay teachers were hired only when called teachers were unavailable.
*178 Respondent Cheryl Perich was first employed by Hosanna-­Tabor as a lay teacher in 1999. After Perich completed her colloquy later that school year, Hosanna-Tabor asked her to become a called teacher. Perich accepted the call and re­ceived a “diploma of vocation” designating her a commis­sioned minister. Id., at 42.
Perich taught kindergarten during her first four years at Hosanna-Tabor and fourth grade during the 2003-2004 school year. She taught math, language arts, social studies, sci­ence, gym, art, and music. She also taught a religion class four days a week, led the students in prayer and devotional exercises each day, and attended a weekly school-wide chapel service. Perich led the chapel service herself about twice a year.
Perich became ill in June 2004 with what was eventually diagnosed as narcolepsy. Symptoms included sudden and deep sleeps from which she could not be roused. Because of her illness, Perich began the 2004-2005 school year on dis­ability leave. On January 27, 2005, however, Perich notified the school principal, Stacey Hoeft, that she would be able to report to work the following month. Hoeft responded that the school had already contracted with a lay teacher to fill Perich’s position for the remainder of the school year. Hoeft also expressed concern that Perich was not yet ready to re­turn to the classroom.
On January 30, Hosanna-Tabor held a meeting of its con­gregation at which school administrators stated that Perich was unlikely to be physically capable of returning to work that school year or the next. The congregation voted to offer Perich a “peaceful release” from her call, whereby the congregation would pay a portion of her health insurance premiums in exchange for her resignation as a called teacher. Id., at 178, 186. Perich refused to resign and produced a note from her doctor stating that she would be able to return to work on February 22. The school board urged Perich to *179 reconsider, informing her that the school no longer had a position for her, but Perich stood by her decision not to resign.
On the morning of February 22 — the first day she was medically cleared to return to work — Perich presented her­self at the school. Hoeft asked her to leave but she would not do so until she obtained written documentation that she had reported to work. Later that afternoon, Hoeft called Perich at home and told her that she would likely be fired. Perich responded that she had spoken with an attorney and intended to assert her legal rights.
Following a school board meeting that evening, board chairman Scott Salo sent Perich a letter stating that Hosanna-Tabor was reviewing the process for rescinding her call in light of her “regrettable” actions. Id., at 229. Salo subsequently followed up with a letter advising Perich that the congregation would consider whether to rescind her call at its next meeting. As grounds for termination, the letter cited Perich’s “insubordination and disruptive behavior” on February 22, as well as the damage she had done to her “working relationship” with the school by “threatening to take legal action.” Id., at 55. The congregation voted to rescind Perich’s call on April 10, and Hosanna-Tabor sent her a letter of termination the next day.
B
Perich filed a charge with the Equal Employment Oppor­tunity Commission, alleging that her employment had been terminated in violation of the Americans with Disabilities Act of 1990, 104 Stat. 327, 42 U. S. C. § 12101 et seq. The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability. § 12112(a). It also prohibits an employer from retaliating “against any indi­vidual because such individual has opposed any act or prac­tice made unlawful by [the ADA] or because such individual *180 made a charge, testified, assisted, or participated in any man­ner in an investigation, proceeding, or hearing under [the ADA].” § 12203(a).[1]
The EEOC brought suit against Hosanna-Tabor, alleging that Perich had been fired in retaliation for threatening to file an ADA lawsuit. Perich intervened in the litigation, claiming unlawful retaliation under both the ADA and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1602(a) (1979). The EEOC and Perich sought Perich’s reinstatement to her former position (or frontpay in lieu thereof), along with backpay, compensatory and punitive damages, attorney’s fees, and other injunctive relief.
Hosanna-Tabor moved for summary judgment. Invoking what is known as the “ministerial exception,” the Church argued that the suit was barred by the First Amendment because the claims at issue concerned the employment rela­tionship between a religious institution and one of its minis­ters. According to the Church, Perich was a minister, and she had been fired for a religious reason — namely, that her threat to- sue the Church violated the Synod’s belief that Christians should resolve their disputes internally.
The District Court agreed that the suit was barred by the ministerial exception and granted summary judgment in *181 Hosanna-Tabor’s favor. The court explained that “Hosanna-­Tabor treated Perich like a minister and held her out to the world as such long before this litigation began,” and that the “facts surrounding Perich’s employment in a religious school with a sectarian mission” supported the Church’s character­ization. 582 F. Supp. 2d, at 891-892. In light of that de­termination, the court concluded that it could “inquire no further into her claims of retaliation.” Id., at 892.
The Court of Appeals for the Sixth Circuit vacated and remanded, directing the District Court to proceed to the merits of Perich’s retaliation claims. The Court of Appeals recognized the existence of a ministerial exception barring certain employment discrimination claims against religious institutions — an exception “rooted in the First Amendment’s guarantees of religious freedom.” 597 F. 3d 769, 777 (2010). The court concluded, however, that Perich did not qualify as a “minister” under the exception, noting in particular that her duties as a called teacher were identical to her duties as a lay teacher. Id., at 778-781. Judge White concurred. She viewed the question whether Perich qualified as a minister to be closer than did the majority, but agreed that the “fact that the duties of the contract teachers are the same as the duties of the called teachers is telling.” Id., at 782, 784. We granted certiorari. 563 U. S. 903 (2011).
II
The First Amendment provides, in part, that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.” We have said that these two Clauses “often exert conflicting pressures,” Cutter v. Wilkinson, 544 U. S. 709, 719 (2005), and that there can be “internal tension ... between the Establishment Clause and the Free Exercise Clause,” Tilton v. Richardson, 403 U. S. 672, 677 (1971) (plurality opinion). Not so here. Both Reli­gion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers.
*182 A
Controversy between church and state over religious of­fices is hardly new. In 1215, the issue was addressed in the very first clause of Magna Carta. There, King John agreed that “the English church shall be free, and shall have its rights undiminished and its liberties unimpaired.” The King in particular accepted the “freedom of elections,” a right “thought to be of the greatest necessity and impor­tance to the English church.” J. Holt, Magna Carta App. IV, p. 317, cl. 1 (1965).
That freedom in many cases may have been more theoreti­cal than real. See, e. g., W. Warren, Henry II 312 (1973) (re­counting the writ sent by Henry II to the electors of a bish­opric in Winchester, stating: “I order you to hold a free election, but forbid you to elect anyone but Richard my clerk”). In any event, it did not survive the reign of Henry VIII, even in theory. The Act of Supremacy of 1534, 26 Hen. 8, ch. 1, made the English monarch the supreme head of the Church, and the Act in Restraint of Annates, 25 Hen. 8, ch. 20, passed that same year, gave him the authority to appoint the Church’s high officials. See G. Elton, The Tudor Constitution: Documents and Commentary 331-332 (1960). Various Acts of Uniformity, enacted subsequently, tightened further the government’s grip on the exercise of religion. See, e. g., Act of Uniformity, 1559, 1 Eliz., ch. 2; Act of Uni­formity, 1549, 2 & 3 Edw. 6, ch. 1. The Uniformity Act of 1662, for instance, limited service as a minister to those who formally assented to prescribed tenets and pledged to follow the mode of worship set forth in the Book of Common Prayer. Any minister who refused to make that pledge was “deprived of all his Spiritual Promotions.” Act of Uniform­ity, 1662, 14 Car. 2, ch. 4.
Seeking to escape the control of the national church, the Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of wor­ship. See T. Curry, The First Freedoms: Church and State *183 in America to the Passage of the First Amendment 3 (1986); McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1422 (1990). William Penn, the Quaker proprietor of what would eventually become Pennsylvania and Delaware, also sought independence from the Church of England. The charter creating the province of Pennsylvania contained no clause establishing a religion. See S. Cobb, The Rise of Religious Liberty in America 440-441 (1970).
Colonists in the South, in contrast, brought the Church of England with them. But even they sometimes chafed at the control exercised by the Crown and its representatives over religious offices. In Virginia, for example, the law vested the governor with the power to induct ministers presented to him by parish vestries, 2 Hening’s Statutes at Large 46 (1642), but the vestries often refused to make such presenta­tions and instead chose ministers on their own. See H. Eck-­enrode, Separation of Church and State in Virginia 13-19 (1910). Controversies over the selection of ministers also arose in other Colonies with Anglican establishments, includ­ing North Carolina. See C. Antieau, A. Downey, & E. Rob­erts, Freedom From Federal Establishment: Formation and Early History of the First Amendment Religion Clauses 10-­11 (1964). There, the royal governor insisted that the right of presentation lay with the Bishop of London, but the colo­nial assembly enacted laws placing that right in the vestries. Authorities in England intervened, repealing those laws as inconsistent with the rights of the Crown. See id., at 11; Weeks, Church and State in North Carolina, Johns Hopkins U. Studies in Hist. & Pol. Sci., 11th Ser., Nos. 5-6, pp. 29-­36 (1893).
It was against this background that the First Amendment was adopted. Familiar with life under the established Church of England, the founding generation sought to fore­close the possibility of a national church. See 1 Annals of Cong. 730-731 (1789) (remarks of J. Madison) (noting that the *184 Establishment Clause addressed the fear that “one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would compel others to conform”). By forbidding the “establishment of religion” and guaranteeing the “free exercise thereof,” the Religion Clauses ensured that the new Federal Government — unlike the English Crown — would have no role in filling ecclesiasti­cal offices. The Establishment Clause prevents the Govern­ment from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of reli­gious groups to select their own.
This understanding of the Religion Clauses was reflected in two events involving James Madison, “ ‘the leading archi­tect of the religion clauses of the First Amendment.’ ” Ari­zona Christian School Tuition Organization v. Winn, 563 U. S. 125, 141 (2011) (quoting Flast v. Cohen, 392 U. S. 83, 103 (1968)). The first occurred in 1806, when John Carroll, the first Catholic bishop in the United States, solicited the Executive’s opinion on who should be appointed to direct the affairs of the Catholic Church in the territory newly acquired by the Louisiana Purchase. After consulting with President Jefferson, then-Seeretary of State Madison responded that the selection of church “functionaries” was an “entirely eccle­siastical” matter left to the Church’s own judgment. Letter from James Madison to Bishop Carroll (Nov. 20, 1806), re­printed in 20 Records of the American Catholic Historical Society 63 (1909). The “scrupulous policy of the Consti­tution in guarding against a political interference with re­ligious affairs,” Madison explained, prevented the Gov­ernment from rendering an opinion on the “selection of ecclesiastical individuals.” Id., at 63-64.
The second episode occurred in 1811, when Madison was President. Congress had passed a bill incorporating the Protestant Episcopal Church in the town of Alexandria in what was then the District of Columbia. Madison vetoed the bill, on the ground that it “exceeds the rightful authority *185 to which Governments are limited, by the essential distinc­tion between civil and religious functions, and violates, in particular, the article of the Constitution of the United States, which declares, that ‘Congress shall make no law re­specting a religious establishment.’” 22 Annals of Cong. 982-983 (1811). Madison explained:
“The bill enacts into, and establishes by law, sundry rules and proceedings relative purely to the organization and polity of the church incorporated, and comprehend­ing even the election and removal of the Minister of the same; so that no change could be made therein by the particular society, or by the general church of which it is a member, and whose authority it recognises.” Id., at 983 (emphasis added).
B
Given this understanding of the Religion Clauses — and the absence of government employment regulation generally — it was some time before questions about government interfer­ence with a church’s ability to select its own ministers came before the courts. This Court touched upon the issue in­directly, however, in the context of disputes over church property. Our decisions in that area confirm that it is impermissible for the government to contradict a church’s determination of who can act as its ministers.
In Watson v. Jones, 13 Wall. 679 (1872), the Court consid­ered a dispute between antislavery and proslavery factions over who controlled the property of the Walnut Street Presbyterian Church in Louisville, Kentucky. The General Assembly of the Presbyterian Church had recognized the an­tislavery faction, and this Court — applying not the Constitu­tion but a “broad and sound view of the relations of church and state under our system of laws” — declined to question that determination. Id., at 727. We explained that “when­ever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] *186 church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them.” Ibid. As we would put it later, our opinion in Watson “radiates ... a spirit of freedom for re­ligious organizations, an independence from secular control or manipulation — in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.” Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America, 344 U. S. 94, 116 (1952).
Confronting the issue under the Constitution for the first time in Kedroff, the Court recognized that the “[f]reedom to select the clergy, where no improper methods of choice are proven,” is “part of the free exercise of religion” protected by the First Amendment against government interference. Ibid. At issue in Kedroff was the right to use a Russian Orthodox cathedral in New York City. The Russian Ortho­dox churches in North America had split from the Supreme Church Authority in Moscow, out of concern that the Author­ity had become a tool of the Soviet Government. The North American churches claimed that the right to use the cathe­dral belonged to an archbishop elected by them; the Supreme Church Authority claimed that it belonged instead to an archbishop appointed by the patriarch in Moscow. New York’s highest court ruled in favor of the North American churches, based on a state law requiring every Russian Or­thodox church in New York to recognize the determination of the governing body of the North American churches as authoritative. Id., at 96-97, 99, n. 3, 106, n. 10.
This Court reversed, concluding that the New York law violated the First Amendment. Id., at 107. We explained that the controversy over the right to use the cathedral was “strictly a matter of ecclesiastical government, the power of the Supreme Church Authority of the Russian Orthodox Church to appoint the ruling hierarch of the archdiocese of *187 North America.” Id., at 115. By “passing] the control of matters strictly ecclesiastical from one church authority to another,” the New York law intruded the “power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment.” Id., at 119. Accord­ingly, we declared the law unconstitutional because it “di­rectly prohibited] the free exercise of an ecclesiastical right, the Church’s choice of its hierarchy.” Ibid.
This Court reaffirmed these First Amendment principles in Serbian Eastern Orthodox Diocese for United States and Canada v. Milivojevich, 426 U. S. 696 (1976), a case involving a dispute over control of the American-Canadian Diocese of the Serbian Orthodox Church, including its property and assets. The Church had removed Dionisije Milivojevich as bishop of the American-Canadian Diocese because of his de­fiance of the church hierarchy. Following his removal, Dio-­nisije brought a civil action in state court challenging the Church’s decision, and the Illinois Supreme Court “pur­ported in effect to reinstate Dionisije as Diocesan Bishop,” on the ground that the proceedings resulting in his removal failed to comply with church laws and regulations. Id., at 708.
Reversing that judgment, this Court explained that the First Amendment “permit[s] hierarchical religious organiza­tions to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudi­cating disputes over these matters.” Id., at 724. When ec­clesiastical tribunals decide such disputes, we further ex­plained, “the Constitution requires that civil courts accept their decisions as binding upon them.” Id., at 725. We thus held that by inquiring into whether the Church had followed its own procedures, the State Supreme Court had “unconsti­tutionally undertaken the resolution of quintessentially reli­gious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals” of the Church. Id., at 720.
*188 C
Until today, we have not had occasion to consider whether this freedom of a religious organization to select its ministers is implicated by a suit alleging discrimination in employ­ment. The Courts of Appeals, in contrast, have had exten­sive experience with this issue. Since the passage of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e et seq., and other employment discrimination laws, the Courts of Ap­peals have uniformly recognized the existence of a “ministe­rial exception,” grounded in the First Amendment, that pre­cludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers.[2]
We agree that there is such a ministerial exception. The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group’s right to shape its own faith and mission through its appointments. According the state *189 the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.
The EEOC and Perich acknowledge that employment dis­crimination laws would be unconstitutional as applied to reli­gious groups in certain circumstances. They grant, for ex­ample, that it would violate the First Amendment for courts to apply such laws to compel the ordination of women by the Catholic Church or by an Orthodox Jewish seminary. Brief for Federal Respondent 31; Brief for Respondent Perich 35-36. According to the EEOC and Perich, religious orga­nizations could successfully defend against employment dis­crimination claims in those circumstances by invoking the constitutional right to freedom of association — a right “im­plicit” in the First Amendment. Roberts v. United States Jaycees, 468 U. S. 609, 622 (1984). The EEOC and Perich thus see no need — and no basis — for a special rule for minis­ters grounded in the Religion Clauses themselves.
We find this position untenable. The right to freedom of association is a right enjoyed by religious and secular groups alike. It follows under the EEOC’s and Perich’s view that the First Amendment analysis should be the same, whether the association in question is the Lutheran Church, a labor union, or a social club. See Perich Brief 31; Tr. of Oral Arg. 28. That result is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations. We cannot accept the re­markable view that the Religion Clauses have nothing to say about a religious organization’s freedom to select its own ministers.
The EEOC and Perich also contend that our decision in Employment Div., Dept, of Human Resources of Ore. v. Smith, 494 U. S. 872 (1990), precludes recognition of a minis­terial exception. In Smith, two members of the Native American Church were denied state unemployment benefits *190 after it was determined that they had been fired from their jobs for ingesting peyote, a crime under Oregon law. We held that this did not violate the Free Exercise Clause, even though the peyote had been ingested for sacramental pur­poses, because the “right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion pre­scribes (or proscribes).” Id., at 879 (internal quotation marks omitted).
It is true that the ADA’s prohibition on retaliation, like Oregon’s prohibition on peyote use, is a valid and neutral law of general applicability. But a church’s selection of its ministers is unlike an individual’s ingestion of peyote. Smith involved government regulation of only outward phys­ical acts. The present case, in contrast, concerns govern­ment interference with an internal church decision that af­fects the faith and mission of the church itself. See id., at 877 (distinguishing the government’s regulation of “physical acts” from its “lending] its power to one or the other side in controversies over religious authority or dogma”). The contention that Smith forecloses recognition of a ministerial exception rooted in the Religion Clauses has no merit.
HH J — I h-i
Having concluded that there is a ministerial exception grounded in the Religion Clauses of the First Amendment, we consider whether the exception applies in this case. We hold that it does.
Every Court of Appeals to have considered the question has concluded that the ministerial exception is not limited to the head of a religious congregation, and we agree. We are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister. It is enough for us to conclude, in this our first case involving the ministerial exception, that the exception covers Perich, given all the cir­cumstances of her employment.
*191 To begin with, Hosanna-Tabor held Perich out as a minis­ter, with a role distinct from that of most of its members. When Hosanna-Tabor extended her a call, it issued her a “diploma of vocation” according her the title “Minister of Re­ligion, Commissioned.” App. 42. She was tasked with per­forming that office “according to the Word of God and the confessional standards of the Evangelical Lutheran Church as drawn from the Sacred Scriptures.” Ibid. The congre­gation prayed that God “bless [her] ministrations to the glory of His holy name, [and] the building of His church.” Id., at 43. In a supplement to the diploma, the congregation under­took to periodically review Pencil's “skills of ministry” and “ministerial responsibilities,” and to provide for her “contin­uing education as a professional person in the ministry of the Gospel.” Id., at 48.
Perieh’s title as a minister reflected a significant degree of religious training followed by a formal process of commis­sioning. To be eligible to become a commissioned minister, Perich had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher. She also had to obtain the endorsement of her local Synod district by submitting a petition that contained her academic transcripts, letters of recommendation, personal statement, and written answers to various ministry-related questions. Finally, she had to pass an oral examination by a faculty committee at a Lu­theran college. It took Perich six years to fulfill these re­quirements. And when she eventually did, she was commis­sioned as a minister only upon election by the congregation, which recognized God’s call to her to teach. At that point, her call could be rescinded only upon a supermajority vote of the congregation — a protection designed to allow her to “preach the Word of God boldly.” Brief for Lutheran Church — Missouri Synod as Amicus Curiae 15.
Perich held herself out as a minister of the Church by ac­cepting the formal call to religious service, according to its terms. She did so in other ways as well. For example, she *192 claimed a special housing allowance on her taxes that was available only to employees earning their compensation “ ‘in the exercise of the ministry.’” App. 220 (“If you are not conducting activities ‘in the exercise of the ministry/ you cannot take advantage of the parsonage or housing allowance exclusion” (quoting Lutheran Church — Missouri Synod Bro­chure on Whether the IRS Considers Employees as a Minis­ter (2007)). In a form she submitted to the Synod following her termination, Perich again indicated that she regarded herself as a minister at Hosanna-Tabor, stating: “I feel that God is leading me to serve in the teaching ministry.... Iam anxious to be in the teaching ministry again soon.” App. 53.
Perich’s job duties reflected a role in conveying the Church’s message and carrying out its mission. Hosanna-­Tabor expressly charged her with “lead[ing] others toward Christian maturity” and “teaching] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church.” Id., at 48. In fulfilling these responsibilities, Perich taught her students religion four days a week, and led them in prayer three times a day. Once a week, she took her students to a school-wide chapel service, and — about twice a year — she took her turn leading it, choosing the lit­urgy, selecting the hymns, and delivering a short message based on verses from the Bible. During her last year of teaching, Perich also led her fourth graders in a brief devo­tional exercise each morning. As a source of religious in­struction, Perich performed an important role in transmit­ting the Lutheran faith to the next generation.
In light of these considerations — the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious func­tions she performed for the Church — we conclude that Per-­ich was a minister covered by the ministerial exception.
In reaching a contrary conclusion, the Court of Appeals committed three errors. First, the Sixth Circuit failed to *193 see any relevance in the fact that Perich was a commissioned minister. Although such a title, by itself, does not automati­cally ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant, as is.the fact that significant religious training and a recognized religious mission underlie the description of the employee’s position. It was wrong for the Court of Appeals — and Per-­ich, who has adopted the court’s view, see Perich Brief 45— to say that an employee’s title does not matter.
Second, the Sixth Circuit gave too much weight to the fact that lay teachers at the school performed the same religious duties as Perich. We express no view on whether someone with Perich’s duties would be covered by the ministerial ex­ception in the absence of the other considerations we have discussed. But though relevant, it cannot be dispositive that others not formally recognized as ministers by the church perform the same functions — particularly when, as here, they did so only because commissioned ministers were unavailable.
Third, the Sixth Circuit placed too much emphasis on Per-­ich’s performance of secular duties. It is true that her reli­gious duties consumed only 45 minutes of each workday, and that the rest of her day was devoted to teaching secular sub­jects. The EEOC regards that as conclusive, contending that any ministerial exception “should be limited to those employees who perform exclusively religious functions.” Brief for Federal Respondent 51. We cannot accept that view. Indeed, we are unsure whether any such employees exist. The heads of congregations themselves often have a mix of duties, including secular ones such as helping to man­age the congregation’s finances, supervising purely secular personnel, and overseeing the upkeep of facilities.
Although the Sixth Circuit did not adopt the extreme posi­tion pressed here by the EEOC, it did regard the relative amount of time Perich spent performing religious functions as largely determinative. The issue before us, however, is *194 not one. that can be resolved by a stopwatch. The amount of time an employee spends on particular activities is rele­vant in assessing that employee’s status, but that factor can­not be considered in isolation, without regard to the nature of the religious functions performed and the other considera­tions discussed above.
Because Perich was a minister within the meaning of the exception, the First Amendment requires dismissal of this employment ■ discrimination suit against her religious em­ployer. The EEOC and Perich originally sought an order reinstating Perich to her former position as a called teacher. By requiring the Church to accept a minister it did not want, such an order would have plainly violated the Church’s free­dom under the Religion Clauses to select its own ministers.
Perich no longer seeks reinstatement, having abandoned that relief before this Court. See Perich Brief 58. But that is immaterial. Perich continues to seek frontpay in lieu of reinstatement, backpay, compensatory and punitive dam­ages, and attorney’s fees. An award of such relief would operate as a penalty on the Church for terminating an un­wanted minister, and would be no less prohibited by the First Amendment than an order overturning the termina­tion. Such relief would depend on a determination that Hosanna-Tabor was wrong to have relieved Perich of her po­sition, and it is precisely such a ruling that is barred by the ministerial exception.[3]
The EEOC and Perich suggest that Hosanna-Tabor’s as­serted religious reason for firing Perich — that she violated the Synod’s commitment to internal dispute resolution — was pretextual. That suggestion misses the point of the ministe­rial exception. The purpose of the exception is not to safe­guard a church’s decision to fire a minister only when it is made for a religious reason. The exception instead ensures *195 that the authority to select and control who will minister to the faithful — a matter “strictly ecclesiastical,” Kedroff, 344 U. S., at 119 — is the church’s alone.[4]
IV
The EEOC and Perich foresee a parade of horribles that will follow our recognition of a ministerial exception to em­ployment discrimination suits. According to the EEOC and Perich, such an exception could protect religious organiza­tions from liability for retaliating against employees for re­porting criminal misconduct or for testifying before a grand jury or in a criminal trial. What is more, the EEOC con­tends, the logic of the exception would confer on religious employers “unfettered discretion” to violate employment laws by, for example, hiring children or aliens not authorized to work in the United States. Brief for Federal Respond­ent 29.
Hosanna-Tabor responds that the ministerial exception would not in any way bar criminal prosecutions for interfer­ing with law enforcement investigations or other proceed­ings. Nor, according to the Church, would the exception bar government enforcement of general laws restricting eligibil­ *196 ity for employment, because the exception applies only to suits by or on behalf of ministers themselves. Hosanna-­Tabor also notes that the ministerial exception has been around in the lower courts for 40 years, see McClure v. Sal­vation Army, 460 F. 2d 563, 558 (CA5 1972), and has not given rise to the dire consequences predicted by the EEOC and Perich.
The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church’s de­cision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to ad­dress the applicability of the exception to other circum­stances if and when they arise.
* * *
The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission. When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way.
The judgment of the Court of Appeals for the Sixth Circuit is reversed.

It is so ordered.

 The ADA itself provides religious entities with two defenses to claims of discrimination that arise under subchapter I of the Act. The first pro­vides that “[t]his subchapter shall not prohibit a religious corporation, as­sociation, educational institution, or society from giving preference in em­ployment to individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities.” § 12113(d)(1) (2006 ed., Supp. III). The second provides that “[u]nder this subchapter, a reli­gious organization may require that all applicants and employees conform to the religious tenets of such organization.” § 12113(d)(2). The ADA’s prohibition against retaliation, § 12203(a), appears in a different subchap-­ter — subchapter IV. The EEOC and Perich contend, and Hosanna-Tabor does not dispute, that these defenses therefore do not apply to retalia­tion claims.

 See Natal v. Christian and Missionary Alliance, 878 F. 2d 1575, 1578 (CA1 1989); Rweyemamu v. Cote, 520 F. 3d 198, 204-209 (CA2 2008); Pe-­trusha v. Gannon Univ., 462 F. 3d 294, 303-307 (CA3 2006); EEOC v. Roman Catholic Diocese, 213 F. 3d 795, 800-801 (CA4 2000); Combs v. Central Tex. Annual Conference, 173 F. 3d 343, 345-350 (CA5 1999); Hol-­lins v. Methodist Healthcare, Inc., 474 F. 3d 223, 225-227 (CA6 2007); Schleicher v. Salvation Army, 518 F. 3d 472, 475 (CA7 2008); Scharon v. St. Luke’s Episcopal Presbyterian Hospitals, 929 F. 2d 360, 362-363 (CA8 1991); Werft v. Desert Southwest Annual Conference, 377 F. 3d 1099,1100-­1104 (CA9 2004) (per curiam); Bryce v. Episcopal Church, 289 F. 3d 648, 655-657 (CA10 2002); Gellington v. Christian Methodist Episcopal Church, Inc., 203 F 3d 1299, 1301-1304 (CA11 2000); EEOC v. Catholic Univ., 83 F. 3d 455, 460-463 (CADC 1996).

 Perich does not dispute that if the ministerial exception bars her re­taliation claim under the ADA, it also bars her retaliation claim under Michigan law.

 A conflict has arisen in the Courts of Appeals over whether the minis­terial exception is a jurisdictional bar or a defense on the merits. Com­pare Hollins, 474 F. 3d, at 225 (treating the exception as jurisdictional); and Tomic v. Catholic Diocese of Peoria, 442 F. 3d 1036, 1038-1039 (CA7 2006) (same), with Petrusha, 462 F. 3d, at 302 (treating the exception as an affirmative defense); Bryce, 289 F. 3d, at 654 (same); Bollard v. California Province ofSoc. of Jesus, 196 F. 3d 940, 951 (CA9 1999) (same); and Natal, 878 F. 2d, at 1576 (same). We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is “whether the allegations the plaintiff makes entitle him to relief,” not whether the court has “power to hear [the] ease.” Morrison v. National Australia Bank Ltd., 561 U. S. 247, 254 (2010) (internal quotation marks omitted). District courts have power to consider ADA claims in cases of this sort, and to decide whether the claim can proceed or is instead barred by the ministerial exception.