# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-IA-01951-SCT

*GREATER FAIRVIEW MISSIONARY BAPTIST
CHURCH , PAYTON LACY, BAXTER EVANS,
HARRELL NEAL, KELVIN THIGPEN AND
DAVID EDWIN LEVY*

*v.*

*DANNY RAY HOLLINS*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/30/2013 |
| TRIAL JUDGE: | HON. J. DWAYNE THOMAS |
| TRIAL COURT ATTORNEYS: | PRECIOUS MARTIN |
| | SUZANNE KEYS |
| | FELICIA PERKINS |
| | JESSICA AYERS |
| | MINOR BUCHANAN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | FELICIA PERKINS |
| | JESSICA AYERS |
| ATTORNEY FOR APPELLEE: | SUZANNE KEYS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND VACATED - 03/26/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., LAMAR AND CHANDLER, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Greater Fairview Missionary Baptist Church's pastor, Danny Ray Hollins, was placed

on paid administrative leave after he was accused of inappropriate sexual contact with a

minor. When the church members decided to vote on whether to retain him as pastor, he

sought injunctive relief in chancery court. The chancellor issued a temporary restraining order, but the church voted anyway and dismissed Hollins. The chancellor then vacated the vote and ordered the church to conduct another vote, this time with certain court-ordered procedures regarding notice, eligibility, vote-counting, and security. This Court granted the church defendants' motion for interlocutory appeal, and we now vacate the chancery court's orders in this case.

**FACTS AND PROCEDURAL HISTORY**

¶2.     In October 2012, Danny Ray Hollins was pastor of Greater Fairview Missionary Baptist Church in Jackson. That month, he was placed on paid administrative leave when a member of the church accused him of inappropriate sexual behavior with a minor.[1] Later that year, the church decided to hold a vote on whether to retain Hollins as pastor. That vote originally was scheduled to take place in early 2013. But tensions arose in the church about Hollins's status, giving rise to a "chaotic situation," and the vote did not take place as planned. Instead, the church voted to allow the Deacons' Ministry to form a legal committee and to hire outside legal counsel for assistance in resolving the internal conflict. With the help of a local law firm, the church developed an election procedure and scheduled a vote for March 2, 2013.

---

[1]During this action, that minor sued Hollins for the alleged sexual misconduct. In her complaint, she alleged that Hollins had lured her into a hotel room "to engage in sexual intercourse as well as other lewd and lascivious acts."

¶3.     One of the deacons[2] compiled a list of active church members who were at least sixteen years old and certified it under oath the day before the vote. The deacons and their counsel arranged for a certified public accounting firm to count and certify the votes and for security personnel to be present. Upon entering the church, members reported at various tables based on the first letter of their last name, identified themselves, and received a ballot. That ballot was "regular" if the voter was on the membership roll and "conditional" if he or she was not. Ballots also were distributed to members of the church who were "shut-in" and could not make it to the church that day. Once the ballots were completed, they were deposited into boxes which were under the control of the CPA and his assistant.

¶4.     On March 1, 2013, the day before the vote, Hollins filed a petition in the Hinds County Chancery Court seeking "to enjoin any unauthorized and improper meetings and/or actions taken outside a properly called membership meeting." The petition named the church and five deacons as defendants.[3] Hollins asserted that the church planned to have a meeting on March 2 "to vote on a resolution discharging [him] as pastor." He claimed that the vote would be invalid because (1) "there ha[d] been no certification of the list of members in good standing who would be entitled to vote . . .";[4] (2) absent such certification, adequate notice to eligible members could not be accomplished; and (3) the state denominational guidelines

---

[2]This deacon was not one of the deacons later named as a defendant by Hollins.

[3] Those deacons were Payton Lacy, Baxter Evans, Harrell Neal, Kelvin Thigpen, and David Edwin Levy.

[4]Hollins did not specify who he thought should have "certified" the list.

3

had not been followed because "there ha[d] been no attempts at Conciliation or other notice given to Plaintiff as pastor as required."

¶5.    Hollins also claimed that he would be irreparably harmed if he was "voted out as Pastor," in that his reputation would suffer, he would lose his income, and he would suffer emotionally.  Finally, Hollins asserted that there was "a high likelihood [that he would succeed] in the merits of his case, namely that any meeting of church membership without proper certification of voter rolls and notice and adherence to all established guidelines is void . . . ."  Hollins's counsel certified that a temporary restraining order ("TRO") was needed, that he had been unable to notice the defendants, that the defendants would not be prejudiced by the TRO, and that on "information and belief [the church] is not represented by counsel duly hired by the church membership."[5]

¶6.    The chancellor issued the TRO, apparently without reading it.[6]  While five deacons and the church itself were named as defendants, the TRO was served on only four of the deacons, as the agent for service of process for the church was deceased and could not be served.  The TRO purported to enjoin "any membership meeting," but the chancellor later explained it was intended to "restrain any vote that may take place."

_____

[5]The record reflects that, prior to filing the petition, Hollins had attended a meeting at the church and had observed the church's counsel, Felicia Perkins, explaining how the upcoming election would be conducted and fielding questions about the voting process. But apparently it was Hollins's belief that, because he had not presided over or called the meeting wherein the church gave the Deacons' Ministry authority to hire counsel, such counsel was "not duly hired" and therefore not due to be noticed of the petition or TRO.

[6]The chancellor said from the bench: "I do not — I usually don't read the order specifically.  I trust the lawyers to word their orders as they choose to word them."

4

¶7.    Despite the TRO, the vote took place as scheduled on March 2, 2013. The ballot contained one question: "Should Danny Hollins, Ph.D., remain pastor of Greater Fairview M.B. Church?" More than four hundred church members voted, and less than fifty percent voted to retain Hollins as pastor.

¶8.    Hollins quickly filed a motion to set aside the results of the vote and to hold the church defendants in contempt and incarcerate them. Hollins also filed a motion asking the court to set a procedure for determining eligible voters and for voting. On March 7, 2013, defendants filed a motion to dissolve the TRO, to dismiss the action, and for sanctions against Hollins. The chancellor heard brief arguments from each side the next day. Although no evidence was introduced at that time, the chancellor did set aside the results of the March 2 vote.[7]

¶9.    The chancellor also stated that "we will conduct further evidence to allow a further vote by this church to determine if Mr. Hollins is the pastor of this church or not." He asked the parties to provide him with the "documents necessary to start that," explaining, "I have done several of these before. If you can't do it, I will." He continued, saying, "we will conduct a vote, and I will supervise it with proper guidelines." In his Order, the chancellor

---

[7]In addition to vacating the vote, the chancellor also verbally ordered the church to resume paying Hollins his salary, stating that "[Hollins] can be the interim preacher or the at large preacher or whatever they want to call him, but he will be paid and he will be given his key to the church." When the order was reduced to writing and filed, however, it did not explicitly mention paying Hollins, but said he was to "be reinstated as an employee." The church never resumed paying him. The parties argued this point in several motions and at several hearings.

explained that he was setting aside the vote because "[d]efendants went forward with their meeting or vote in spite of this Court's order."

¶10. On March 12, 2013, the defendants filed a motion for reconsideration. They argued that "[t]here were several egregious mistakes of fact and law made in the Court's Order." Among those, they said that the TRO did not expressly prohibit a vote; that none of the defendants was served prior to the vote; that on March 8 there were no issues before the chancellor because the TRO was moot at that point since the vote had taken place; that the chancellor had ruled without any evidence on March 8; and that by reinstating Hollins as "interim pastor," the court had granted relief that Hollins did not request. The defendants also argued that the church had "employed extraordinary measures and incurred considerable expenses in its efforts to regain peace and dignity within the church;" that more than four hundred members of the church had voted, including Hollins's wife, children, and siblings, and that more than fifty percent voted to remove Hollins. The defendants concluded by stating that "[t]he church has spoken," and an "unconscionable injustice would occur if [Hollins was afforded relief]."

¶11. The litigation continued for several months, with additional hearings on various recusal motions, contempt motions, motions to dismiss, and efforts by Hollins to get back-pay from the church. On October 8, 2013, the chancellor issued the Memorandum Opinion of the Court. In it, the chancellor noted that "in an effort to extract [himself] from this 'religious thicket,' [he had] on numerous occasions, urged the parties to meet together and

devise an agreed procedure for a new vote." The chancellor also noted that the Constitution and Bylaws of the church provided that:

> the government of the Church is vested in the body of believers who compose it. It is subject to the control of no other Ecclesiastical body, but it recognizes and sustains the obligations of mutual counsel and co-operation which are common among Baptist Churches.

The chancellor found that "[t]he Constitution and Bylaws do not address the procedure for notifying the congregation of such events." He further found that the "normal custom and practice" of the church was "lacking in formality," so the Deacons' Ministry, "along with counsel, attempted to formulate a fair procedure for the vote on the dismissal of [Hollins]." However, the chancellor then determined that "these efforts fall short in that *they were a violation of this Court's Temporary Restraining Order*." (Emphasis added.)

¶12. Before setting out the specific guidelines for how the new vote should take place, the chancellor noted that the church had

> adopted a Constitution and Bylaws and a Handbook of Church Ministries Policies and Procedures. This Court has thoroughly and carefully reviewed each of these documents. After such review, this Court can unequivocally find that [the church] lacks the adopted procedures for determining church members eligible for voting, notification proceedings necessary for establishing a voting meeting, procedures for conducting a vote with regard to the discharge or retention of a pastor, and procedures for the determining the proper number of votes necessary to discharge or retain a pastor.

Furthermore, despite the chancellor's hesitation to get involved in "ecclesiastical matters," the chancellor determined that he "must intervene in an effort to restore peace to the congregation and to prevent further deterioration of a church congregation."

7

¶13. The chancellor relied on this Court's decision in *Pilgrim Rest Missionary Baptist Church ex rel. Board of Deacons v. Wallace*, 835 So. 2d 67 (Miss. 2003), and explained that the "Mississippi Supreme Court has previously determined that where a congregational church . . . lacks the established procedures for electing its leaders, the Court may decide on a proper procedure." The chancellor then laid out procedures for the new vote, including voter eligibility and notice requirements. The chancellor originally scheduled the vote for December 1, 2013, but because several motions subsequently were filed and set for hearing, the vote was rescheduled for January 5, 2014. On December 19, 2013, this Court granted the defendants' petition for interlocutory appeal and stayed the trial court proceedings.

## STANDARD OF REVIEW

¶14. This Court employs a limited standard of review when reviewing decisions of a chancellor. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000) (citing *Reddell v. Reddell*, 696 So. 2d 287 (Miss. 1997)). But a "de novo standard of review is applied to questions of law, legal conclusions, and jurisdictional questions." *Aladdin Constr. Co., Inc. v. John Hancock Life Ins. Co.*, 914 So. 2d 169, 174 (Miss. 2005) (internal citations omitted).

## DISCUSSION

¶15. The church defendants present three issues on appeal:

**1. Did the trial court have subject-matter jurisdiction over the proceeding and personal jurisdiction over the parties?**

**2. Did the temporary restraining order prohibit the March 2 vote?**

**3. Did the trial court correctly apply *Pilgrim Rest*?**

8

¶16.   We decline to address the second issue, as the other two issues are dispositive, and we have reorganized those issues for purposes of this opinion.

## I.     The chancery court had personal jurisdiction over the parties.

¶17.   The church argues that the chancery court lacked personal jurisdiction over it, because Hollins served the TRO on only four of the deacon defendants individually.  They argue that "[t]here was no evidence before the trial court, and the trial court did not find, that the individual deacons who were sued . . . had any individual authority to conduct anything at the church . . . . "  Hollins argues that the deacons who were served *were* authorized agents of the church for service of process, because they had some authority, and because the other possible agents were either deceased or adverse.  We agree with Hollins and find that the defendants were properly served.

¶18.   "The concept of personal jurisdiction comprises two distinct components:  amenability to jurisdiction and service of process."  ***DeMolo v. Toche Marine, Inc.***, 711 F. 2d 1260, 1264 (5th Cir. 1983) (citing ***Terry v. Raymond Int'l, Inc.***, 658 F. 2d 398, 401 (5th Cir. 1981), *cert. denied***, 456 U.S. 928 (1982)).[8]  "Service of process is simply the physical means by which that jurisdiction is asserted." ***Id.***  Mississippi Rule of Civil Procedure 4(d)(4) governs service of process on an organization such as a church.  Under that rule, service "shall be made . . . by delivering a copy of the summons and of the complaint to an officer, a managing or

---

[8]There is no question that the church and its members were amenable to jurisdiction in Hinds County Chancery Court, so the only issue is whether the church was properly served.

general agent, or to any other agent authorized by appointment or by law to receive service of process." Miss. R. Civ. P. 4(d)(4).

¶19. This Court has stated that it "must examine each case to determine whether the person was authorized as an agent for purposes of accepting service of process." *Johnson v. Rao*, 952 So. 2d 151, 156 (Miss. 2007) (citing *Williams v. Kilgore*, 618 So. 2d 51, 56 (Miss. 1992)). "Only employees with some authority are classified as agents authorized to accept service of process on behalf of an employer." *Johnson*, 952 So. 2d at 154 (citing *Saxony Mills v. Wagner & Co.*, 47 So. 899, 901 (Miss. 1908)).

¶20. Hollins served the TRO on Payton Lacy, Harrell Neal, Kelvin Thigpen, and David Edwin Levy. All four were deacons of the church, elected by the members and vested with some authority, especially in times when there was no pastor. There was also testimony that one of the deacons was a "facilitator," and as such, had some authority even as to the other deacons. After careful examination of the record, we are satisfied that the four deacons who were personally served had "some authority" and were therefore qualified as "authorized agents" to accept service.

## II. The chancery court did not have subject-matter jurisdiction over this action.

¶21. Although we find that the chancery court had personal jurisdiction over the church, that does not end the inquiry. Mississippi courts "are not authorized to resolve every claim and dispute that may arise between our citizens. The plaintiff must file a complaint which alleges some *cognizable claim* or cause of action against the defendant." *In re Bell*, 962 So. 2d 537, 541 (Miss. 2007) (emphasis added). And even though Section 159 of the Mississippi

Constitution gives chancery courts jurisdiction over "[a]ll matters in equity," that jurisdiction has limits. Miss. Const. art. 6, § 159. One important limit, this Court has explained, is the "require[ment] that an application for injunctive relief *be predicated upon some legal or equitable claim which will, at some point, proceed to the merits*. Indeed an application for injunctive relief must demonstrate . . . *a substantial likelihood of prevailing on the merits of the claim*." **In re Bell**, 962 So. 2d at 541 (citations omitted) (emphasis added).

¶22.    Here, Hollins cannot prevail on the merits, because the United States Supreme Court has made it clear that the First Amendment places ministerial church-employment decisions beyond the reach of courts. *See* **Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.**, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2013). In other words, Hollins cannot satisfy the "cognizable claim" requirement established by this Court. *See, e.g.*, **Hosanna-Tabor,** 132 S. Ct. at 704 (2012) ("Our decisions in that area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers."); **Sawyer v. Brandon**, 825 So. 2d 26, 30 (Miss. 2002) ("The church authorities and such tribunals as they may set up for themselves are supreme in such matters. Their decision is final as to *who shall be the pastor* and other officers. Such disputes are ecclesiastical in their nature and *the courts have no control over them*.") (emphasis added).

¶23.    In **Hosanna-Tabor**, a Lutheran church school fired a teacher, apparently in retaliation for threatening to take legal action. **Hosanna-Tabor**, 132 S. Ct. at 700. The EEOC filed suit, "alleging that [the teacher] had been fired in retaliation for her threatening to file an ADA lawsuit." **Id.** The school invoked what is known as the "ministerial exception,"

11

arguing that "the suit was barred by the First Amendment, because the claims at issue concerned the employment relationship between a religious institution and one of its ministers." *Id.* at 701.[9]

¶24.    In affirming the teacher's dismissal, the Court began its analysis by detailing religious freedom from the Magna Carta to the Puritans escaping religious persecution and state control in England, to colonial parishioners at odds with church leadership based in England, and ultimately to the ratification of the First Amendment. *Id.* at 702-03.  That amendment bears directly on ecclesiastical decisions such as choosing ministers:

> By forbidding the "establishment of religion" and guaranteeing the "free exercise thereof," the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices.  The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own.

*Id.* at 703.

¶25.    The Court then noted that, because of that understanding of religious freedom and because of a general lack of government employment regulation, "it was some time before questions about government interference with a church's ability to select its own ministers came before the courts." *Id.* at 704.  Its decisions "in the context of disputes over church property," however, "confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.*

---

[9]The Court noted that the federal "Courts of Appeals have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of such legislation (Title VII) to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor*, 132 S. Ct. at 705; *see also id.* n.2 (collecting cases).

¶26.    The Court held that both the Establishment and Free Exercise clauses bar suits brought on behalf of ministers against their churches claiming termination in violation of employment discrimination laws. *Id.* at 705-06. To hold otherwise, the Court explained, would allow an unlawful interference that robs churches of protection the First Amendment guarantees:

> The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes on the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minster to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 706.

¶27.    Here, Hollins did not even claim that Greater Fairview had terminated him in violation of any discrimination law or any other law. Rather, he argued generally that the church should not have been able to terminate him in the manner it chose. As detailed above, the law is clear that courts cannot constitutionally pass on that issue, and the chancery judge therefore erred when he entered the TRO initially, as well as when he vacated the church's vote and ordered a new one.

¶28.    We disagree with Hollins's argument that this Court's decision in ***Pilgrim Rest*** is "well-established precedent" that chancery courts have jurisdiction over "business affairs of a congregational church, and that it is "the seminal authority . . . on issues involving the role of courts in congregational church governance." First, this Court has mentioned ***Pilgrim***

13

***Rest*** only once when addressing the question of court involvement in church matters,[10] so we do not view it as the "well-established precedent" presented by Hollins.

¶29. Second, and more importantly, when read in light of the rest of this Court's "church governance" jurisprudence, ***Pilgrim Rest*** represents a narrow exception to the longstanding practice of this Court to refuse to involve itself in ecclesiastical matters.[11] There, this Court

---

[10] *See* ***Roman Catholic Diocese of Jackson v. Morrison***, 905 So. 2d 1213, 1241 (Miss. 2005) (distinguishing ***Pilgrim Rest*** because it involved a congregational church and not a hierarchical one, and citing it only for the proposition that civil courts may, "*in appropriate circumstances*, order that [a] vote take place") (emphasis added).

[11] *See* ***Smith v. Charles***, 24 So. 968, 968 (Miss. 1899) (affirming a chancellor's dismissal of an intra-church dispute in three sentences: "This is a contest between two factions of King Solomon's Baptist Church of Vicksburg. The chancellor dismissed the bill for want of jurisdiction in the court to entertain the case made by the bill and the proof. We concur in his view, that the court had no jurisdiction."); ***Mt. Helm Baptist Church v. Jones***, 30 So. 714, 716 (Miss. 1901) (explaining that this Court "exercises no ecclesiastical jurisdiction. It accepts what the highest ecclesiastical authority in each church promulgates as the faith and practice of that church; that authority, under Baptist polity, being each separate Baptist church"); ***Windham v. Ulmer***, 59 So. 810, 810 (Miss. 1912) ("The Baptist Church does not, as a religious sect or denomination, possess a constitution or creed, like the Presbyterian, Methodist, and many other churches. Its form of government is congregational, and therefore purely democratic.") (quoting ***Poynter v. Phelps***, 111 S.W. 699, 702 (Ky. 1908)) (internal quotation marks omitted); ***Allen v. Roby***, 67 So. 899, 900 (Miss. 1915) (holding that when a simple majority of a Baptist church makes a decision, "the courts will not interfere to determine questions involving doctrines or government of a Baptist church"); ***Edwards v. De Vance***, 103 So. 94 (Miss. 1925) ("The office of deacon is purely ecclesiastical, and the incumbent thereof is subject at all times to the control of the church; the only persons entitled thereto being those the church recognizes as such. Over the office and elections to it the courts have no control, and it is here wholly immaterial whether the election of any of the parties hereto was illegal; that being for the determination of the church, and those of the parties hereto who are recognized by the church as such have the right to discharge the duties of deacon thereof."); ***Grantham v. Humphries***, 188 So. 313 (Miss. 1939) (Facing the question whether an ousted pastor and those loyal to him were entitled to injunctive relief and use of the church property, this court "reach[ed] the same conclusion the chancellor did. The question involved is ecclesiastical and not one for the civil courts. The church authorities and such tribunals as they may set up for themselves are supreme in such matters. Their decision is final as to who shall be the pastor and other

addressed a dispute between two opposing factions in a Baptist Church. *Pilgrim Rest*, 835 So. 2d at 69. One faction, including the pastor and several deacons, filed a complaint (on behalf of the church) in chancery court to enjoin another faction, which included another deacon and the Board of Trustees, from "doing any act relating to the business affairs of the Church which is against the Church's by-laws." *Id.*

¶30. In response, the Board of Trustees filed a complaint that also purported to be on behalf of the church. *Id.* The Trustees' complaint sought "a declaration that the Church membership had the right to relieve [the pastor] . . . ." *Id.* The complaint also sought a TRO enjoining the other faction from spending any of the church's funds and requiring "them to provide an accounting and reimburse the Church for funds spent." *Id.*

¶31. The chancery court "granted the Trustees a preliminary injunction freezing the Church's funds and appointed [two] consulting experts to complete an accounting of all

---

officers. Such disputes are ecclesiastical in their nature and the courts have no control over them."); *Blue v. Jones*, 230 So. 2d 569 (Miss. 1970) (concluding "that the question of who are the proper trustees of the property of this congregational church, and the identity of the pastor and deacons are ecclesastical questions rather than issues of property rights. The government of a Baptist Church is congregational and democratic, with each church a distinct organization, independent of others. The members of the church have full power to call a pastor and elect property trustees and deacons. In a long line of decisions, this Court has held that it will not interfere to determine questions involving the government of a congregational type church."); *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200, 206 (Miss. 1998) (adopting a "neutral-principles approach" to resolving *property* disputes involving churches, but affirming that matters ecclesiastical are "outside the parameters of the application of neutral principles"); *Sawyer v. Brandon*, 825 So. 2d 26 (Miss. 2002) (noting that a chancellor had jurisdiction over the property aspect of a church dispute, but had "wisely declined to become ensnared in the controversies regarding membership and voting as these were certainly ecclesiastical matters").

15

funds deposited and to reconcile Church finances." *Id.* Thereafter, the chancery court consolidated the two actions and conducted a hearing. At the hearing, the pastor testified that he had ignored a letter from the church announcing his removal because the membership had not complied with the bylaws. *Id.* at 70. Specifically, the pastor argued that the accusations against him had been made by two inactive members, and those accusations had not been investigated by the deacons as the bylaws required. *Id.* Also, although the church members had met and voted to remove the pastor, he alleged that the meeting "was improper because it was not held on church property, and it was not set by the Board of Deacons and presided over by the pastor." *Id.*

¶32. After the hearing, "the chancellor ordered a list of qualified voters to be compiled and a formal election for the members to decide if [the pastor] would remain pastor." *Id.* at 69. The chancellor's order explained that she had examined the church's bylaws and had found, based on the hearing testimony, that very few of the bylaws had been followed. *Id.* She expressed her doubts as to whether one could follow the bylaws even if one wanted to, given the "ambiguity" and "unclearness." The chancellor ordered a new vote, and the church voted 54-0 to remove the pastor, who, along with the deacons, appealed. *Id.* at 70-71. They argued "that the chancellor's judgment violated the First and Fourteenth Amendments to the United States Constitution in that a civil court became involved in a[n] ecclesiastical dispute." *Id.* at 71.

¶33. Although this Court affirmed the chancellor, it was careful to note that the dispute was not about "the propriety or justification for dismissing a pastor." *Id.* at 71. Rather, the issue

16

before this Court was whether the "church itself has spoken. If it has, this court inquires no further. It if has not, this court may restore the status quo to enable the church to act." *Id.* at 72. Here, we are not faced with two factions of a church fighting over money and property and arguing about whether the by-laws have been followed. Rather, we are faced only with an aggrieved pastor who is unhappy that his church voted to terminate him. As this Court stated in *Pilgrim Rest*, the "'court's jurisdiction is limited to purely secular issues, and the court must not be involved in ecclesiastical issues.'" *Id.* at 72 (citation omitted). In sum, we find that the chancery judge erred when he treated this ecclesiastical controversy as a secular one—a pastor who is unhappy about being terminated by a church simply does not present a secular controversy. As such, the chancellor had no authority initially to issue the TRO or to vacate Greater Fairview's vote and order a new one, as Hollins cannot prevail on the merits of his claim.

## CONCLUSION

¶34. Because Hollins's request for a TRO presented a purely ecclesiastical controversy, the chancery court was without jurisdiction to hear it. As such, he erred when he issued the TRO and when he vacated Greater Fairview's vote and ordered a new one, and we therefore reverse and vacate the orders of the Hinds County Chancery Court in this matter.

¶35. **REVERSED AND VACATED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**